Argued July 6; modified July 31; rehearing denied
September 12, 1933

# HERROLD *v.* HARTLEY

(24 P. (2d) 338)

*G. M. Roberts,* of Medford (Wm. M. McAllister, of Medford, on the brief), for appellant.

*Custer E. Ross,* of Salem (A. E. Reames, of Medford, on the brief), for respondent.

BAILEY, J. This suit was instituted by the plaintiff, L. O. Herrold, against the defendant, C. A. Hartley, to require the defendant to give an accounting to plaintiff of the paving and sand and gravel businesses conducted by him and the defendant at Medford, Oregon, under the supervision of defendant, since August, 1928, and for a decree that plaintiff is the owner of the plants and equipment used in connection with said paving and sand and gravel businesses. The defendant Hartley filed an answer putting in issue many of the allegations of the complaint, asserting ownership of the sand and gravel plant and equipment in himself, consenting to and agreeing with plaintiff that there should be an accounting of the Medford transactions, and requesting an accounting from the plaintiff in relation to the business conducted by the plaintiff and the defendant at Oregon City during the three years immediately prior to the commencement of their operations at Medford. From a decree declaring plaintiff to be the owner, and entitled to the immediate possession, of the paving and sand and gravel plants and equipment at Medford, and requiring defendant to file a statement relative to his operation of the sand and gravel plant at Medford subsequent to March 30, 1931, the defendant prosecutes this appeal.

In 1924 the plaintiff and the defendant discussed procuring contracts for, and engaging in, the grading and paving business. Prior to that time, and since 1911, the plaintiff, located at Salem, had been engaged in grading and paving work in the state of Oregon. The defendant lived at Silverton, where he had at one time been city engineer. Since 1901 he had been a civil engineer and more or less connected with paving and grading work. After discussing the possibility of obtaining road work, the defendant in 1924 made trips to southern Oregon and to California in the hope of procuring paving contracts, but was unsuccessful. His expenses in connection with those trips were borne equally by himself and the plaintiff.

In 1925 the defendant learned of street paving to be done at Oregon City and, to a large extent through his efforts, grading and street paving contracts were obtained there, taken in the name of plaintiff. At that time the plaintiff had a plant at Silverton, which was not suitable for the Oregon City work, and in order to secure the contracts at Oregon City the plaintiff agreed to construct a new paving plant there, which he did at an expense of between $7,000 and $8,000.

Work under the first contract was started at Oregon City in June or July of 1925, and completed during the calendar year. After the plaintiff had reimbursed himself for the amount expended in constructing the new plant there remained a profit estimated at $8,760.52.

The defendant was superintendent or foreman of the street grading and paving, and one Hutchison, who had been employed by the plaintiff for a number of years, was in charge of the plant. Each was paid $200 per month and the defendant in addition was al-

lowed a drawing account for his automobile expenses. During the winter months of 1925-26 no paving work was done, but the defendant employed his time in obtaining new grading and paving contracts at Oregon City and interviewing property owners as to the kind of pavement desired. He continued to receive $200 a month and automobile expenses.

Further grading and paving work was done at Oregon City during the year 1926 under much the same circumstances as during the previous year, and a net profit of $23,677.31 was realized. The same procedure was followed during the next two years, up to about the middle of 1928, with a net profit of $22,936.83 for 1927 and $14,808.86 for 1928. This, in addition to a plant paid for out of earnings, made a total profit of $70,185.52 for the Oregon City operations.

While work was being done at Oregon City the banking transactions connected therewith were conducted through an Oregon City bank in the name of L. O. Herrold and Epsie E. Herrold, his wife. Warrants for the work, received by the defendant in most instances, were deposited in the joint account of plaintiff and plaintiff's wife. Checks on that account were drawn in the name of the Herrolds and signed by defendant as superintendent.

In the latter part of 1926 or early in 1927 Hutchison ceased to be employed in the Oregon City work, and Hartley thereafter had charge of both the paving plant and the street work. During the entire period at Oregon City he was also bookkeeper and cashier with relation to said operations. At the end of each season his books were delivered to plaintiff and were audited by plaintiff's wife, who was an experienced bookkeeper, and the result of her audit was submitted to the defendant.

On January 13, 1927, at the suggestion of plaintiff, the defendant drew a check for $1,500 payable to himself, which was entered by the defendant in the ledger as follows: "By instruction L. O. H. Bonus—good will". At the same time, under instruction of plaintiff, a check was drawn in favor of Hutchison for the sum of $600. The amount of this check together with advances made to Hutchison equaled $1,500, and the total was entered by defendant in language identical with that concerning the $1,500 received by himself.

On February 27, 1928, a check in the sum of $500 was drawn by defendant, payable to himself, and the following entry was made: "C. A. Hartley, account interest in the business". The checks of $1,500 and $500 were in addition to the $2,400 paid annually, mostly in $100 checks semi-monthly, to the defendant during the entire period of operating at Oregon City, and in addition to automobile expenses.

From time to time the plaintiff drew and used apparently for his own purposes large sums of money from the joint account of himself and his wife in the Oregon City bank.

In the summer of 1928 a contract was taken in the name of plaintiff at Medford, for the grading and paving of streets. This contract was obtained largely through the efforts of Hartley. Plaintiff and the defendant were unsuccessful in buying sand and gravel at what they considered a reasonable price, and they concluded to operate their own sand and gravel plant for the Medford work. A lease was taken, apparently first in the name of plaintiff and the defendant and a few days later in the name of Hartley alone, on a sand and gravel pit.

The paving plant at Oregon City was not suitable for the Medford work. An abandoned paving plant, owned by Clackamas county, was purchased; the two plants were dismantled and parts thereof were shipped to Medford and there installed. Material for a sand and gravel plant at Medford was purchased and such plant was there erected. Funds for meeting the cost of material used, the erection of these plants and the purchase of equipment were advanced by plaintiff.

According to the testimony of the accountant and auditor, one of plaintiff's witnesses, there was advanced by plaintiff in the Medford operations a total of $37,149.34, and there had been returned to him out of receipts $15,625.99, leaving a balance of $21,523.35 which had not been repaid to plaintiff.

During most of the operations at Medford the paving plant and sand and gravel plant accounts were, as far as possible, kept separately, although at first they were intermingled. Because of the eight-hour law applying to public work, it was decided to conduct the paving plant in the name of Herrold and the sand and gravel plant in the name of Hartley, and, as far as practicable, to keep separate accounts of the operation of the respective plants.

Later on, a contract was entered into with the state highway commission for grading and paving work in Jackson county, and this work was done under much the same conditions as the street work at Medford.

When the defendant Hartley went to Medford and took charge of the work he had no new understanding with plaintiff or different agreement from that under which he had worked at Oregon City. After he had been at Medford a short time he began to complain to Herrold about not having received so much of the

profits realized at Oregon City as he thought he was entitled to have, and in the latter part of 1928 he seems to have become insistent that some definite contract be agreed upon as to his interest in the profits made on the Medford undertaking.

In the early part of January, 1929, plaintiff made a trip east, and from Sacramento, California, sent defendant the following letter: "In accord with recent conversations and also many others of like nature: Be advised that on date of Jan. 1st, 1929, you are admitted to a 25 per cent ownership of the plants and equipment now at Medford, Oregon. This said 25 per cent to be on par with the 75 per cent retained by me in point of profits and losses. The legal ownership shall still be vested in me until my return from the east, and to such time as a mutually satisfactory agreement is prepared. This to be done following my return some five weeks from date".

Accompanying this letter and of even date was another letter from plaintiff to the defendant, giving instructions as to operations at Medford, in which he said: "Find enclosed the letter promised, which I think will serve until I return. In event of failure to return, you may use this letter. Otherwise it is only for your assurance that I am keeping my word".

No response was made by defendant to either of these letters, but on plaintiff's return from the east in March, 1929, the defendant presented to him for his signature the following contract:

"This agreement made and entered into this 27th day of March, 1929, by and between L. O. Herrold, first party, and C. A. Hartley, second party, witnesseth:

"That whereas the parties hereto are at the present time engaged in the sand and gravel, paving and

general contracting business at Medford, Oregon, under the general management and superintendence of the second party, and it is proposed by the parties hereto to continue in said business in the state of Oregon and elsewhere, and the parties desire to definitely fix the future division of profits from said paving, general contracting and sand and gravel business.

"Now, therefore, in consideration of the covenants herein contained it is mutually agreed that the second party shall have charge of and continue to act as superintendent of all such operations and manage said business to the best of his ability and in a proper manner. However, the first party shall at all times be consulted with reference to the management and control of said business and said business shall be continued in accordance with the joint conclusions of the parties hereto after consultation with reference to the matter in the event that anything should come up that might raise a question of difference concerning the same.

"It is further agreed that the net profits from said business shall be divided equally between the parties hereto after the payment of necessary expenses, replacement costs and costs of additions, betterments and improvements to the plants and equipment now being used by the parties hereto. It is expressly agreed and understood that there shall be included as expenses a salary of two hundred ($200.00) dollars per month and maintenance and running expenses of an automobile which amounts shall be paid to the second party hereto. All expense shall be paid monthly together with the expenses of a head bookkeeper at a salary of $200 dollars per month, to be paid annually at the discretion of the party of the first part and a division of profits shall be made and paid to the parties hereto during the third week of January in each year or oftener as mutually agreed upon."

This proposed contract was retained by plaintiff for a few days and later was signed, and both original and copy were returned by him to the defendant, with

this notation attached thereto: "I have signed the contracts and am returning them. Keep them until I come. I want to make some changes of form". No changes, however, were made by the plaintiff.

After the above contract was signed, defendant appeared satisfied and operations continued at Medford and in Jackson county under his supervision. The books were still kept by the defendant and were at all times subject to inspection by the plaintiff, although there is some contention that the sales slips and some of the vouchers either were not retained by the defendant or were not available to the plaintiff. At the end of the first year at Medford the books were audited by Mrs. Herrold and thereafter were either audited by her or reports were made by the defendant.

During these operations at Medford it became necessary to have additional capital and arrangements were made with the banks by plaintiff for loans for the work on hand, and in some instances money was obtained from the banks at Medford by the defendant on his personal note, for the operation of the sand and gravel plant. Interest on these loans was charged to the work at Medford.

For some considerable time after the contract of March 27, 1929, was signed defendant ceased agitation for a settlement between plaintiff and himself. During the latter part of 1930, however, friction which had been developing between plaintiff and the defendant became so pronounced that it was apparent that further cooperation between the two would be impossible. The defendant for some time had again been importuning the plaintiff for an accounting or a more equitable division of the Oregon City profits, and an accounting and settlement for the Medford operations.

After promising defendant an accounting the plaintiff consulted his attorney and, without further conference with the defendant, instituted this proceeding.

It is the defendant's contention that the business conducted at Oregon City was under either a partnership, joint adventure, joint undertaking or profit-sharing employment of defendant by the plaintiff, and that money which was advanced by the plaintiff to start operations at Medford was a part of the funds which belonged to such partnership or joint adventure. It will therefore be necessary to consider first the Oregon City operations, to determine whether or not the same were carried on under a partnership, joint adventure or some other arrangement by the plaintiff and the defendant.

According to plaintiff's testimony, there was no definite agreement or understanding between himself and the defendant relative to the interest each was to have in the Oregon City business, until a week or two after operations there were begun. Defendant, however, stated that at the time the contract for such work was obtained the understanding between himself and the plaintiff was that the work should be carried on as discussed between them before defendant's trip to California, although the evidence was not definite as to terms and conditions which had been agreed upon previously. Shortly after the work had started at Oregon City plaintiff and the defendant discussed conditions under which the defendant should work, and, according to the defendant's version of the matter, it was agreed that he was to have a $200 monthly drawing account for living expenses, plus upkeep of an automobile, and the profits of the undertaking were to be "split" between the parties.

Soon after beginning work at Oregon City, the plaintiff called upon the defendant to furnish him a fidelity bond, and during the years at that place there was a bond in the sum of $3,000 given annually by Hartley and a surety company to the plaintiff, in which Hartley was designated as employee and Herrold as employer. The applications for all the bonds are not included in the record, but that dated July 12, 1928, stated that the employer's business was that of paving contractor and that Hartley had worked for him for three to four years and was employed by him as superintendent and cashier at a salary of $200 per month. To the question requiring him to state the value of his personal property, "whether household goods, cash on hand or in bank, or anything else of value", Hartley wrote in answer: "Cash—Bonds—Auto., Household furniture, etc., $5,000". Under date of January 21, 1927, at the request of Herrold, Hartley furnished him a financial statement, in which he listed his total assets, real and personal, at $2,600, consisting of cash in bank, $300; real estate, $1,000; automobile, $300; and other assets not described, $1,000.

During the latter part of 1925 or early in 1926, after Mrs. Herrold had audited the books for work then completed at Oregon City, it was ascertained that the net profits after paying for installation of the paving plant exceeded $8,000. The audit was given to Hartley and, according to his statement, a discussion then arose between himself and Herrold as to what should be done with the profits, Hartley asserting that Herrold had offered to divide them with him but that he, Hartley, had suggested that Herrold retain the profits as working capital. These profits, however, increased each year until the total exceeded $70,000. Hartley knew

that Herrold was withdrawing money from the Oregon City bank, where the account was kept, but he contends that Herrold stated that he was merely borrowing some of the money for his personal use, that he had $50,000 in the bank drawing interest and that he would furnish whatever money was needed in future operations and would, at any time Hartley desired, divide the profits. These statements as to the terms on which Hartley was connected with the Oregon City operations, the offer to divide the profits at the end of the first year, the assertion that Herrold was "borrowing" the money he withdrew and that the funds were being kept for future operations, were all denied by Herrold. He refers to Hartley's connection with the Oregon City operations as merely that of an employee on a monthly salary and expense account for his automobile with the understanding that, if operations proved profitable, Hartley was to have a bonus, the amount of which was to be determined by Herrold.

Mention has already been made of the fact that money was borrowed at Medford with which to carry on the transactions there and that the interest on such loans was charged to operating expenses. At no time did Hartley seem to object to this borrowing or to the interest paid. As a matter of fact, he borrowed money on his own note to operate the sand and gravel plant at a time when he claimed Herrold had many thousands of dollars belonging to Hartley and a great deal more money available, according to statements attributed to him by Hartley, for operating expenses.

In his testimony Hartley does not state what percentage of the profits at Oregon City he was to receive, except that he understood such profits were to be "split" and that he supposed that he would receive

the same amount thereof as did Herrold. In addition to the facts above narrated, Herrold, during all the operations at Oregon City, reported as his own income the net profits realized each year and paid income tax thereon. This was known to Hartley. At no time did Hartley make any income tax return for his alleged share of the Oregon City business. The reason he gives for not doing so is that he knew Herrold was making such return for all the profits and that he himself had not yet received his share. Although Hartley after going to Medford had frequently requested of Herrold a greater participation in the Oregon City profits, the testimony does not indicate that Hartley was demanding one-half thereof, but merely more than he had already received.

■ After making numerous demands for a greater portion of the Oregon City profits and future profits in the Medford transactions, the contract of March 27, 1929, prepared by or at the instance of Hartley, was submitted by him to the plaintiff for the latter's signature. This contract does not, in our opinion, either directly or by implication, refer to the Oregon City operations, and since it was prepared by the defendant or at his instance it must, in case of doubt or ambiguity in its meaning, be resolved in favor of Herrold and against Hartley. It is plaintiff's contention that this contract was understood as settling the Oregon City controversy by granting to Hartley a certain interest in the Medford operations. The testimony on this point, however, is none too definite or certain.

■■ Relative to the defendant's claim concerning the relationship existing between himself and the plaintiff in the Oregon City operations, the burden of proof was on him to substantiate his contention. This he has

failed to do. In referring to this matter the trial court aptly and correctly said: "The record which the parties made, concurrent with the various transactions as they progressed,—the book entries as they were made,—the withdrawal of profits as they occurred,—all are consistent with the plaintiff's contention, are not consistent with the idea of a partnership or such a joint undertaking as would involve an equal division of profits". The trial court further stated that the adequacy of the bonus was not before the court for determination and that "the court would have no power to grant relief upon the basis of a *quantum meruit*". As a further observation, it seems indeed strange that defendant, after for some time insisting upon a greater portion of the Oregon City profits and a definite division of the Medford profits, would prepare the contract above set forth, without reference to the Oregon City transactions, unless he intended upon the signing thereof by the plaintiff to abandon any future claim to the Oregon City profits. The record is silent as to any further demand on the part of defendant after signing this contract, relative to those profits, until a year or eighteen months thereafter.

In arriving at the conclusion that Hartley was employed by Herrold at Oregon City at $200 a month with an allowance for automobile expenses we have not overlooked the testimony of Herrold that Hartley was to have a part of the profits. It is, however, apparent that Herrold was referring to the bonus which he had told Hartley he would give him, as a part of the profits of the business.

We shall now discuss the Medford operations. As already pointed out, the funds for the purchase of material for, and installation of, the paving and sand

and gravel plants and equipment were advanced by Herrold. According to his own witness he has been reimbursed for these advances $15,625.99, and has still invested therein the sum of $21,523.35.

■ It is the contention of the defendant that the sand and gravel plant and equipment are his property, and he explains his acquisition thereof by saying that several weeks after operations were started at Medford a question arose between himself and Herrold relative to the separation of the two plants in order to avoid any difficulty through possible violation of the eight-hour law pertaining to public works. Hartley, according to his story, protested to Herrold against being a party to any subterfuge and insisted that, if the two plants were to be operated separately and apart actually, there would have to be a *bona fide* transfer of the sand and gravel plant to himself. He asserts that Herrold readily agreed to the proposition and thereupon Hartley became the owner of the sand and gravel plant and equipment. This is denied by Herrold.

According to Hartley's own interpretation, this arrangement was not in effect until November or December, 1928, but on September 12 of that year he individually signed a contract for electric service with the California-Oregon Electric Power Company for the sand and gravel plant, and at that time stated to Mr. Thompson of the power company that the sand and gravel plant was being operated in his name because of the eight-hour law. Furthermore, it is admitted by Hartley that net profits from both plants were to be divided equally between himself and Herrold and that he, Hartley, had charge of both plants. It is therefore not apparent how ownership of the sand and gravel

plant by Hartley would in any way alter the situation relative to the eight-hour law in the work which was being done by Herrold and Hartley, either for the city of Medford or for the state highway commission. The proof does not substantiate Hartley's contention that he is the owner of the sand and gravel plant and equipment, and his contention in regard thereto must be rejected.

■ The plaintiff introduced in evidence a statement of the Medford operations prepared by a certified accountant. In the listing of assets and liabilities as of December 31, 1930, no account whatever was taken of the value of the plants and equipment. This statement shows liabilities of $5,132.46 in excess of assets. The report of income and operating expenses for the period from August 8, 1928, to December 31, 1930, prepared by this accountant, shows income of $173,-095.86 from the paving plant and operating expense of $174,323.93, with an operating deficit for the two plants totaling $26,655.81. Included in the operating expense was the cost of purchase and installation of the two plants and equipment connected therewith, together with cost of renewals, repairs and new equipment, but no consideration is given to the present value of the plants and equipment, which was stipulated to be $31,-900. Nor is Herrold charged with the sum of $2,382.11, profits realized from contracts performed at Salem and Albany during the period of the Medford operations, as this item was retained by Herrold personally and did not appear on the books of the corporation. The accountant also omitted, from the reports above referred to, an item of $350 chargeable to Hartley for profits which he realized on the Siskiyou service station job and retained, and another of $7.32, money with-

drawn to pay his income tax for the year 1929. In the statement of income and disbursements the accountant also failed to give credit to the sand and gravel plant for materials which it delivered to, and which were used by, the paving plant. When we take into consideration the items above mentioned and not listed by the accountant, a profit was made on the Medford operations, and there was no loss as contended by plaintiff. The loss on paving operations was, according to plaintiff's brief, $27,454.35, and the profit on the sand and gravel plant amounted to $788.54, leaving a net loss of $26,655.81. This computation by plaintiff, however, does not include the agreed value of the two plants and equipment, nor does it take into consideration the sums of $2,382.11 and $357.32 retained by the plaintiff and the defendant respectively.

Following is a revised statement of assets, liabilities and investment of the Medford operations as of May 31, 1931, as reconstructed from the statement of the certified accountant above mentioned:

## ASSETS

| | |
|---|---:|
| Cash on hand ...................................$ | 1.52 |
| Cash, Jackson County Bank ............. | 131.52 |
| Cash, First National Bank ............... | 765.56 |
| Accounts receivable: | |
| Sand and gravel ............................ | 1,629.42 |
| C. A. Hartley ................................ | 357.32 |
| L. O. Herrold ................................ | 2,382.11 |
| Inventory, sand and gravel ............. | 3,300.00 |
| Cash deposited with California-Oregon Power Co. ........................ | 112.92 |
| Value of plants and equipment ....... | 31,900.00 |
| Total .......................................... | $40,580.37 |

## LIABILITIES

| | |
|---|---|
| Loan payable, Jack Hartley .............$ | 350.00 |
| Note payable, Jackson County Bank ................................................... | 1,000.00 |
| Payroll payable .................................. | 90.97 |
| Accounts payable: | |
| Sand and gravel ............................ | 1,450.16 |
| Paving operations ......................... | 8,035.41 |
| Notes payable, equipment ............... | 2,153.50 |
| Money advanced by Herrold, unpaid balance ................................... | 21,523.35 |
| Total ........................................... | $34,603.39 |
| NET ASSETS as of May 31, 1931.. | $ 5,976.98 |

We do not intend to imply from the foregoing that the net assets are to be divided equally between the parties.

The contract of March 27, 1929, between the parties to this litigation is in many respects indefinite and uncertain. In computing the income and expenditures for Medford operations the accountant was instructed by the plaintiff to cover the entire period of said operations, and the plaintiff stated that the report ought to cover the whole period. The defendant does not contend otherwise, although he asserts that there is no more reason for including the Medford operations prior to the date of the contract than there is to include the Oregon City operations. The contract, however, recites that the parties are in the general contracting business at Medford, Oregon, and states that they intend to continue in said business in the state of Oregon and elsewhere. The evidence does not clearly show that the rights of the parties would be materially affected, whether the contract is considered as covering the entire period of the Medford operations or only trans-

actions subsequent to March 27, 1929. And since neither party objects seriously to including the entire period, we see no reason to go further into that feature of the case.

■ It is contended by the plaintiff that the defendant was merely an employee of plaintiff during the Medford operations. Although the contract provides that the work is to be done under the general management and superintendence of Hartley, nevertheless it adds that Herrold shall at all times be consulted with reference to the management and control of the business and that the business shall be conducted "in accordance with the joint conclusions" of both parties. The contract does not expressly provide that Hartley shall be responsible for any of the expenses connected with the business. It does state, however, that all expenses shall be paid monthly and, according to Hartley's testimony, he was also responsible for the obligations of the business in like manner as Herrold, and borrowed considerable sums of money therefor on his personal note. The construction which the parties placed on the contract indicates that they were both to share the expenses of the operations and divide the net profits. These net profits were to be divided "after the payment of necessary expenses, replacement costs and costs of additions, betterments and improvements to the plants and equipment now being used by the parties" to the contract.

■ The question arises as to whether certain equipment which was purchased during the operations at Medford belongs to the plaintiff or the value thereof is to be considered as net profits. At the time the contract was entered into it was not intended to limit the operations thereunder to Medford, and naturally while

the two parties were engaged in the contracting business any machinery or equipment purchased would in all probability be needed in their continued operations. At the time of the trial of this case the plants and equipment were of the stipulated value of $31,900. Some of this equipment is referred to in the report of the accountant as "replacements and betterments". Other purchases are mentioned as "new equipment", and it is impossible to state just which equipment is new and which used for replacement, betterments or improvements.

The contract does not expressly refer to and cover new and additional equipment which did not replace that on hand at the time the contract was signed or which was not attached to the plants or not an integral part thereof. The word "additions" as used in the contract has an indefinite meaning. We believe, however, that in view of the facts in this case the word "additions" should not be so construed as to include new and additional equipment which was not attached to, or an integral part of, the plants or equipment as they existed on March 27, 1929. Nor should the contract be so construed as to allow plaintiff such new and additional equipment. Therefore, the plaintiff was not the owner or entitled to the possession of the new and additional equipment, but was entitled to the original plants and equipment and any equipment which replaced the same, the betterments and improvements thereof, and the additions which had become an integral part of the plants and equipment. The new and additional equipment as above described should be considered as a part of the net profits to be divided upon the termination of the relationship between the parties as created by the contract above mentioned.

The decree awarded to the plaintiff a typewriter which, it is admitted by both parties to the litigation, belonged to the defendant and should be awarded to him.

Apparently the circuit court did not intend its decree to be a final settlement of the accounts between the parties to the litigation. After decreeing that plaintiff was the owner of both the Medford plants and all equipment and personal property used in connection therewith, the court ordered the defendant to file "a statement of account, showing his operations of the sand and gravel plant since the modification of the injunction herein made March 30, 1931, and particularly setting out and showing the amounts of sand and gravel and other property disposed of by the defendant, and to whom sold and disposed of; the amount of money received therefor; amounts, if any, owed therefor, and by whom owed; the amount of money on hand resulting from such operations and sales; the amount of indebtedness incurred and still unpaid, and to whom owed, resulting from such operations, and all other facts necessary to enable the court to make a full and complete accounting of such transactions. That this cause be and remain open in order that the court may make a further decree in regard to said matters, and in connection with such accounting, and may make such further decree herein as shall be just and equitable".

In compliance with the requirements of the decree the defendant has filed an accounting, but the same has not been passed upon by the circuit court. In view of the fact that no final decree on the accounting feature of the case was entered by the trial court, and the further fact that the evidence is indefinite and uncertain

as to what comprised the new and additional equipment, as herein defined, if any, the case is remanded to the circuit court, to determine the net profits of the Medford operations, by which is meant all operations of the parties hereto since August 8, 1928, and to divide the same, if any, equally between Herrold and Hartley, pursuant to the contract of March 27, 1929. In arriving at said net profits the new and additional equipment shall be taken into consideration as the same is herein defined. Further proceedings and adjustments in this matter shall be, as far as possible, in accordance with this opinion.

RAND, C. J., BEAN and CAMPBELL, JJ., concur.