Argued May 5; affirmed September 9, 1947; rehearing denied
October 15, 1947

# POWELL *v.* POWELL

(184 P. (2d) 373)

*Celia L. Gavin and Ralph E. Moody* (Gavin & Gavin, of The Dalles, and Ralph E. Moody, of Salem, on brief), for appellants.

*E. F. Bernard* (Collier & Bernard and Wm. K. Shepherd, all of Portland, on brief), for respondent-cross appellant.

Before ROSSMAN, Chief Justice, and LUSK, BELT, HAY and WINSLOW, Justices.

WINSLOW, J. (Pro Tempore)

Respondent Esta May Powell (plaintiff) and Charles L. Powell were married in 1907. Two children were born to this union, Lucille, now Mrs. Goodin, and Marion, the appellant herein, commonly known in this record as Bud. In 1925 Mr. and Mrs. Powell "had a division of property," respondent receiving the home in Portland and what is known in this record as the Moro Ranch. This latter property consisted of 920 acres of wheat land in Sherman County near Moro, most of which was tillable. At that time the family was living in Portland, and, although there seems to have been some estrangement between husband and wife, there was no divorce until later.

In 1929 Charles L. Powell became financially involved and induced respondent to come to his assistance. Accordingly, there was placed on the Moro Ranch a mortgage for $21,000 and the money was

turned over to Charles L. Powell. With reference to this matter, respondent testified:

"Q What did your son say about placing a mortgage on that property?

"A He advised me to do it because Dad made so many promises of what he would do for us if I would only pull this iron out of the fire, he was going to be rolling in wealth in no time; so much he would do for us; and Bud advised me to do it. He said, 'Mother, even if it goes bad I will go up on the ranch, I will pay that off in two or three years, but I advise you to go ahead and do it'."

No sooner had respondent thus obligated herself and encumbered her property, than this country plunged into that period, which will long be known in history as "the financial crisis of the '30's," in which gigantic businesses collapsed, banks closed by the hundreds, never to be opened again, commodity prices tumbled, and business generally went to the wall. Not the least to suffer from these repercussions was the American farmer. True, he wasn't out of employment. He could still work (16 hours a day). He could still produce the necessities of life. But farm prices reached an all time low, and he was unable to secure his cost of production, to say nothing of paying taxes, interest, or anything on the principal of his indebtedness.

That was the situation which confronted respondent, and she faced it without the strong right arm of her husband, whom she had so recently financially befriended. The children were in school at the University of Oregon. First Lucille dropped out and went to work. The farm was rented on a crop share basis. Respondent had plenty of wheat, but it wasn't worth anything. To try to meet the crisis, she took in board-

ers. She was confronted with the payment of taxes, interest and principal which she could not meet.

Into this rather dark situation there came a ray of hope. She had an opportunity to lease the place for cash. Bud was still in school. Before renting for cash, she wrote to Bud about the situation, and he called her on the telephone. Regarding this telephone conversation, she testified as follows:

> "Q State to the court what your son said about that?
>
> "A Well, he was all against it, because, in fact, he called me up from Eugene. He said, 'Mother, don't do anything about it, I will be home next weekend, we will talk this over; don't do anything about it; I want to do that myself.' So, when he came home, he said, 'I am not getting much good out of school, not nearly as much as I should, and I am going to drop out. Anyway, I want to go up there and take this over and gain the experience that I should derive there to pay this out; I feel responsible for the debt being honored and I want to pay it off'."
>
> "Q Did he say what he wanted in return for that?
>
> "A He said he wanted nothing but a living."

In keeping with his promise, Bud discontinued his work at the University and returned home, and they held a family conference. The situation was anything but promising. As Bud put it: "Well, things were very tough at that time, and she [respondent] didn't have any money, or I didn't have any money; nobody had any money * * *."

Lack of money wasn't all their troubles. There were no buildings on the farm to accommodate Bud, and there was no machinery or equipment with which

to operate. Notwithstanding these difficulties, the family—and by the family we mean respondent, Lucille and Bud—were very close and harmonious during these trying and depressing times. As Lucille put it: "We were a very harmonious "threesome"—mother, Bud and I." In the words of King David of old, they were each saying to the others: "Cast in thy lot among us; let us all have one purse." They pooled their interests. Lucille continued to work; respondent continued to take in boarders; they secured a loan on the Portland property; and Bud, a lad of 19 years, went forth to slay a financial Goliath.

One of the issues in this case is: What was the business relationship between appellant and respondent when appellant took over the operation of the ranch? We shall by-pass this question at this time and continue with the narrative.

Bud went to the ranch in February of 1931. The crop share lease continued on part of the place until that fall. Bud stayed with and worked for his uncle, Roy Powell. He exchanged work, rented and borrowed machinery and equipment, plowed and worked the summer fallow, obtained seed, and sowed his first crop in the fall of 1931. He and his mother borrowed on this crop as soon as it was sown. He continued to work, to exchange work, to borrow and rent machinery and equipment, and, in the summer of 1932, he harvested 11,000 bushels of wheat, but found that the best price obtainable was 29¢ per bushel.

When Bud expressed discouragement, he was, to say the least, only expressing an honest emotion. Less stout-hearted souls might have surrendered to the mortgage company, but not the Powells. While they had many things on the one side of the ledger to discourage and defeat them, they likewise had certain

intangible assets on the other side of the ledger. Typical of the American farmer in his best tradition, they had the will to work, the ability to economize and indomitable optimism. They believed, and were willing to sacrifice to make that belief come true, that better conditions, better prices were just ahead. In addition to this, Bud had some "good uncles"—Uncle Roy on his father's side, Uncle Walter on his mother's side, and Uncle Sam. They all helped mightily. There was still another asset on the credit side of the ledger. Instead of the oft painted hard-hearted, grasping, soulless mortgage company, they were indebted to a mortgage company which, not only extended the time for payments of both interest and principal, but was willing to advance additional funds to pay taxes and assist in the operation of the ranch, a policy which in the long run, not only proved generous, but extremely wise.

Mr. Stalnaker, the Portland representative of the mortgage company, really extended a helping hand. In fact, his file of correspondence on this subject, covering the period from 1930 to 1943, which he identified and left with the court and most of which was received in evidence, gives a better picture of the difficulties encountered by the Powells and their uncompromising determination to win, than does the testimony.

From it we gather such glimpses of the operation as this:

Bud to Stalnaker:

" * * * You see, we must have money to pay the taxes and the barest of operating expenses, so we can't give it all to you.

"If this money will not satisfy you, I guess you will be forced to take the land. This is the best we possibly can do at this time.

"Mr. Stalnaker, I have worked hard, and I have done my best in every way. If you can possibly give me a little time and not press me too much before another crop, I think I can work this out."

Bud to Stalnaker:

"I am very glad to hear of a plan to reduce the interest rate on this loan.

"Yes, crops this year are turning out even better than I expected. The fall wheat, I think, will average a little better than forty bushels per acre."

Bud to Stalnaker:

"Today marks another interest paying date, but instead of sending you money I am asking for an advance of $200."

Stalnaker to Bud:

"In compliance with your request, we are enclosing check for $200 * * *. We know that you will make every effort to keep expenses down to the minimum. With your tractor you should be able to * * * earn additional money in assisting others so that your own expenses will be practically offset. * * * "

"Mr. Montgomery's estimate of your crop was quite encouraging and while the price at the present moment is down, we cannot help but feel that it will be better at the time you are ready to sell."

Bud to Stalnaker:

"Last Thursday, June 13th, we received at Moro, sixty-eight one hundredths of an inch of moisture. This helped our plight a great deal, and our prospects at the present time, for a crop, are much better. * * *

"Present price f. o. b. Moro is sixty two cents. This is a bit discouraging, but perhaps we can sell on a speculators' market, or maybe the present administration will take a notion to buy the farmers' vote."

Stalnaker to Bud:

"We have been greatly interested in the current price of wheat and feel that the price will be much better after harvest time. It has been our opinion for a long time that the government is doing everything it can to keep down the price of wheat as it has an important bearing in the living expenses of the ordinary American family."

Bud to Stalnaker:

"Soon you will receive a "Bill of Sale," with my assignment, to the Oregon Mutual Life Insurance Co. of Portland for one Allis Chalmers Tractor No. 2626. The money for this engine is now due and payable to the Moro Grain Growers, and I will appreciate it very much if you will advance $2805.45 to them at this time, for payment * * *.""

Stalnaker to Bud:

" * * * We are today forwarding to the Moro Grain Growers Association our check for $2805.45 payable to you and Mrs. Powell. Mrs. Powell has already endorsed the check and we ask that you call at the office of the Moro Grain Growers so that they will be in a position to collect on it.

" * * * We are pleased to note that you have a large number of acres under contract to plow and trust that you will be able to return to us the full amount of the advance so that it will be unnecessary to take any great amount from this year's crop to apply on the tractor. I am sure that you very much desire that this operation stand on its own legs."

Bud to Stalnaker:

"Perhaps if the world market will rise a bit and they settle this strike situation without serious trouble, we may get 84 or 85 cents net."

Bud to Stalnaker:

"Since I last wrote you the situation in Sherman County has changed greatly. During the ripening

stage of our crops, we had several hot days that cut our yield quite a bit and at this time I believe the average yield per acre will be very little more than 20 bushels. The market at this time appears to be very weak in the face of this strike * * *.''

Stalnaker to Bud:

''We were very much disturbed over the fact that the hot winds of late cut the yield one-third. However, if you can harvest about 20 bushels an acre we feel that the price will be sufficient to make the year as a whole a good one for you.''

Bud to Stalnaker:

''P. S. You won't forget to send that money? You see, credit is very scarce up here and I do not wish to abuse that which I have.''

Stalnaker to Bud:

''As requested * * * we are enclosing a check for $100.00 * * *. We are pleased to note that your operating expenses will be well within your original estimate.''

Through the leniency of Mr. Stalnaker, the Powells were permitted to hold the '32 and the '33 crops until late in 1933 at which time they sold for 72 and 74.3 cents per bushel. With this encouragement, Bud continued to carry on, and, summarized, it may be said that, by hard work, personal ingenuity and genuine cooperation, he did a magnificent job. In fact, in 1938, he produced 22,000 bushels of wheat. The mortgage company each year sent a personal representative to the ranch to investigate conditions. The reports, which are in the Stalnaker file, uniformly read: Inspected farm, land in good condition, well farmed, crops in good condition.

In 1933 they commenced to acquire some machinery. The first piece acquired was a tractor which Bud

practically built. After the tractor came plows, disks, harrows, weeders, drills, and, finally in 1936, a combine. With this equipment Bud commenced to make some headway. During all of this time, he was doing outside work for his neighbors, returns from which went into the main operational fund.

In 1939, encouraged by their success of 1938, they purchased what we shall call herein the Burres Ranch of 1314 acres for the purchase price of $60,000. The method of financing this purchase will be referred to later. It is admitted that, at least from this time, they operated as partners. This continued until the summer of 1944. During this entire time, Bud had done all the business. Monies obtained from loans and advances, as well as from sale of wheat and his outside work, were banked in different banks, all subject to his check. With this money he paid taxes, interest, bought equipment, paid operational costs, paid his own living expenses and, if there was anything left, he applied it on the principal of the mortgages. From time to time respondent requested some accounting of these monies. In turn he promised to account, but consistently failed to do so. In 1941 the parties refinanced by securing a loan from The Travelers Insurance Company for $54,000 which was secured by a mortgage on both places.

During this time Bud had married, had a family and, in 1943, his wife divorced him. He seems to have prospered upon hard work, long hours and tough financial sledding; but, when his home crumbled and fell in upon him, he lost heart. He wanted to quit. "Bud seemed an entirely changed person * * *. He was very unhappy, dissatisfied." Out of that dissatisfaction came unpleasant incidents, thus marring

an otherwise almost perfect picture of a beautiful and harmonious relationship between mother and son.

Respondent commenced this suit for dissolution of the partnership, and to compel appellant to give an accounting of partnership monies and property handled by him during the time that she contends the partnership continued, namely, from 1939. She also asked for, and there was appointed in July 1945, a receiver to take charge of partnership assets and wind up the affairs thereof. Thereafter and just prior to the commencement of the trial, appellant filed an amended answer admitting the partnership from January 1939, alleging in much detail the performance of services on his part, the value thereof, and the advancement of funds commencing with the year 1931 to and including 1944.

He then alleges, in paragraph XXVI, as follows:

"That on account of such work, money and individual advances on the part of this defendant, to the partnership, the said partnership is indebted to this defendant for the sums as set forth in paragraphs VII and XXVI, inclusive; * * *."

In paragraph XXV he alleges:

"That from the years 1936 to 1944, inclusive, this defendant farmed, upon an individual lease, 100 acres for C. L. Powell and realized $6,000.00 therefrom and devoted all of such sum to the expenses and uses of the partnership and advanced such sum to such partnership."

He alleges in paragraph XXVIII that there is a crop growing on the partnership property at the time of the filing of the amended answer. In paragraph XXXII he alleges, as part of the partnership assets, the 1944 crops. In paragraph XXXIII he alleges that

there is an unpaid balance on a note signed by the parties of approximately $36,000 and that $21,000 of this indebtedness is the individual indebtedness of respondent herein.

As a second further and separate answer, he alleges that the partnership commenced in 1930 and that the entire operation from that time to the time of the commencement of the proceeding was a partnership operation.

For a third further and separate answer, he alleges the purchase and joint ownership of what we have referred to as the Burres Ranch. He then asks that respondent's complaint be dismissed, that the partnership be dissolved and an accounting had, that partition be made of the Burres Ranch by sale thereof, and that he be decreed to be the owner of the machinery and implements purchased during the existence of the partnership. He attaches to this answer, as exhibit "A", an account of individual contributions made by him to what he claims was the partnership.

To this amended answer, respondent filed her reply admitting the allegations of appellant's answer regarding the proceeds of the 1944 crops, and likewise that the partnership property had thereon a growing crop, and a joint ownership of the Burres property. Otherwise the reply denies the allegations of the answer.

Pending this litigation in the circuit court, the parties hereto entered into an agreement to sell the Burres Ranch and accumulated equipment to E. J. Scharf and Ruth C. Scharf, and Robert E. Scharf, for $88,000 to be paid by November 1945. This contract is dated the 19th day of February, 1945, and provides that the purchase price is to be paid $20,000 upon the execution thereof, $15,000 on or before April 15, 1945,

and that the purchasers will assume the balance of the indebtedness against both ranches and pay the balance of the purchase price on or before November 1, 1945. The contract then contains this provision:

"The second parties [the Scharfs] agree that they shall procure from Travelers' Insurance Company and deliver to Esta May Powell (at the same time that the first payment is made under this contract,) to wit: said payment of $20,000.00, a full release releasing the separate property of Esta May Powell from the lien of the aforesaid mortgage of Travelers' Insurance Company."

At the time of making this deal, the balance due on this mortgage was $34,935.45.

The trial of this case was commenced on March 5, 1945, and continued intermittently during March, April and May. On May 18th, appellant rested his case and thereupon applied to the court for permission to file a second amended answer, eliminating the contention that commencing in 1931 there was a partnership between the parties, alleging in lieu thereof that there was an agreement to the effect that respondent would convey what we have called the Moro Ranch to him, and praying for specific performance thereof. The trial court denied the application to amend.

At the conclusion of the trial, respondent moved the court for a finding that there was no partnership during the period from 1931 to 1938, inclusive. The court, therefore, filed two memorandum opinions—one disposing of this motion of respondent holding that the evidence did not establish a partnership as of these dates. Then the court took unto itself suitable assistance by way of certified public accountants and, after making a rather extended analysis of the numerous

exhibits and extensive record, filed his second memorandum opinion disposing of the other issues in the case.

Thereupon a decree was entered. By this decree the court determined (1) that there was no partnership during the years 1931 to 1938, inclusive, and (2) that the parties did operate as a partnership commencing in January 1939. (3) The court made a determination as to partnership assets and partnership liabilities. (4) The court made a determination as to the rights of the partners in and to the partnership assets, decreeing that said assets should be distributed equally between the parties, except that out of the moneys in the hands of the receiver and payable to appellant, the receiver shall pay to respondent the sum of $7,906.57, being the amount required to equalize the balance between these partners. The decree further provided that the court retain jurisdiction of the suit for the purpose of carrying out the provisions of the decree.

Helen Powell, the former wife of Marion M. Powell, is a nominal defendant and likewise a nominal appellant herein; and, because her interest is only nominal, we make no further reference to her. We shall, therefore, refer to Marion M. Powell, who has appealed from the whole of the decree, as appellant, and to Esta May Powell, who has prosecuted a cross-appeal from a portion thereof, as respondent.

Appellant sets forth six assignments of error as follows:

"I. The court erred in denying the motion of defendants before the submission of the cause to amend the amended answer and cross complaint alleging specific performance to correspond with the evidence which had been introduced and received

without objection. (Tr. of Evidence, pp. 1517, Abs. of Record, pp. 109-110).

"II. The court erred in finding that a partnership did not exist between 1931 and 1939.

"III. The court erred in not finding that a partnership existed between the plaintiff and the defendant Marion M. Powell between 1931 and 1939.

"IV. The court erred in not making a proper distribution upon a partnership basis between the plaintiff and the defendant Marion M. Powell for the years 1931 to 1939.

"V. The court erred in not making a proper distribution of the partnership money, property and affairs between the plaintiff and the defendant Marion M. Powell from 1939 to 1945.

"VI. The court erred in not allowing to Marion M. Powell the proceeds and profits of his earnings outside of the partnership."

We shall consider these assignments in the order mentioned except, for the sake of brevity, we shall defer assignment I until after our consideration of the other assignments.

Appellant's assignment II. This assignment presents the question of what was the business relationship between appellant and respondent when appellant went to the ranch in 1931. Respondent says that it was nothing more than an effort upon the part of the family, all working together, to save the ranch from the mortgage. She says that it was largely upon appellant's recommendation that she mortgaged it to assist her husband, and that appellant was more than willing to quit school, go to the ranch and fight a tough battle to save it. She likewise contends that it was definitely agreed at the time that appellant was to do the outside work to which he refers, in order to make the operation possible. She claims that she and Lucille also worked, that they borrowed upon her home, and

that all the money from all sources was pooled in order to help; that, while appellant was to have his living and personal expenses, there was no mention of a partnership until January 1939. Lucille, who was present at most of these conversations between respondent and appellant regarding this relationship, corroborates her mother.

On the other hand, appellant says:

"Q During that period of time, what understanding, if any, did you and your mother have about the farming of that place?

"A Well, that goes away back to when we started out there in 1930. The Oregon Mutual Life Insurance Company threatened to foreclose on us because of lack of interest payment, and one thing and another like that; in 1931 they were going to foreclose on the property unless I came up there and did something about it; and they had already had the papers made out to foreclose on that property when I had this agreement with Mr. Stalnaker that I was to stay for five years win or lose, on that proposition; so then at that time my mother was supposed to deed this property to me and I was supposed to keep her in the best means I could for the rest of her life for her deeding that to me, which she never did do, of course. Well, I guess that is the whole story. The Oregon Mutual Life Insurance Company was going to foreclose on that property up to the time we put that mortgage on the house down at Portland to secure—pay the bank up here and one thing and another. They were going to foreclose, and I made this agreement with Mr. Stalnaker at that time for five years. I was supposed to stay, win or lose. They were going to put up the barest of operating expenses.

"Q Did your mother go with you when you went to the Oregon Mutual Life Insurance Company and had a conference with them about the mortgage?

"A No.

"Q She didn't go with you?

"A No, because she was considered out of the picture at that time, out of the picture entirely. They figured it was up to me, and she wasn't even considered in there at that time.

"Q You say your mother was going to deed the place to you; was that a suggestion of hers or a requirement of yours?

"A Well, both, I would say; a requirement of mine, a suggestion of hers at the time, and so on and so forth.

"Q Was there any time arranged for the time that she expected to deed that to you?

"A No, there wasn't really any time arranged. What did you ask me?

"Q I asked if there was any time arranged between you as to when the deed would be given to you?

"A Well, it was supposed to be given to me about the year 1932. Then it went along; she didn't give it to me in 1932, and so forth and so on; she kept stalling along about giving me the deed until she never has given it to me yet.

"Q Then did you have any later agreements about the operation of the place or about your arrangements or understanding about operating the place, did you have any further agreement about it?

"A Well, I handled all the wheat every year and put all the wheat in my name, sold it all in my name, and one thing and another like that. She was just considered out of the picture entirely; and I sent her so much a month to get along on; and I held up to my end of the agreement all right.

"Q How much a month did you send to her?

"A Well, I started in with a hundred dollars a month in 1939. I believe it was; then I sent her a hundred and a quarter a month thereafter, I believe.''

Again on cross-examination:

"Q You testified, I believe, there was no definite agreement, business agreement, when you first came up?

"A Not the first year.

"Q Then at the end of the first year you told your mother things were hopeless up here?

"A I told her we had to have the land in my name.

"Q Did you think that would make operations easier?

"A Yes, it would—far easier.

"Q You told her if she gave you that land you would support her as best you could?

"A I did.

"Q From that time on you claim you really owned the land as well as all the money in the bank account?

"A I operated enough to own the land."

■■■ The burden of establishing the existence of a partnership is upon the partly alleging it. *Preston v. State Industrial Accident Commission,* 174 Or. 553, 563, 149 P. (2d) 957; *Herrold v. Hartley,* 144 Or. 368, 380, 24 P. (2d) 338. A partnership is a voluntary contract between two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, and to divide the profits and share the losses in certain proportions. *Devereaux v. Cockerline,* — Or. —, 170 P. (2d) 727, 733; *Myers v. Olds,* 121 Or. 249, 252 P. 842; *Eilers Music House v. Reine,* 65 Or. 598, 133 P. 788. The existence of a partnership *inter se* depends on the intention of the parties.

In *Willis v. Crawford*, 38 Or. 522, 532, 63 P. 985, 64 P. 866, 53 L. R. A. 904, this court said:

"As between them, no partnership could exist without an intention to enter into that relation; and the plaintiff does not even testify that such was their purpose, but seeks to establish a partnership by the proof of independent facts from which the principal fact is inferable. This would allow a party upon whom the duty of proving the existence of an intention to enter into a partnership devolved to prove the rights of a stranger who had relied upon their conduct in entering into a contract with one of them as evidence of that relation. The plaintiff knew whether it was their intention to form a partnership, and, if such an intention existed, it was his duty so to testify; and, having failed in this respect, we are compelled to overrule the petition."

To the same effect see *First National Bank of Eugene v. Williams*, 142 Or. 648, 661, 20 P. (2d) 222.

In this case the existence of a partnership between these parties during the period between 1931 and 1938, inclusive, is denied by respondent. The burden is upon appellant to establish it. His testimony could not be construed as establishing a relationship even remotely related to a partnership. Even had he testified positively that there was such a partnership, it could not be sustained. His conduct disproved such a relationship. Actions speak louder than words. He transacted and looked after all the business. In the income tax returns, copies of which are in evidence, there isn't a suggestion of a partnership until 1939. From that time forward, such returns were filed.

Again, he contends that respondent had no interest in the operation. The trial court appropriately remarked: "It is difficult to understand how a partnership could be successfully argued or maintained with

one of the partners 'out of the partnership entirely.' ''
It is contended by appellant that such a relationship
may be inferred from the conduct of the parties. As
we have pointed out above, the conduct of appellant
disproves such a relationship. No case has been cited
by appellant holding that a partnership has been estab-
lished where both parties say none exists and where
the conduct of the parties has been entirely incon-
sistent with such a relationship.

■ We hold that appellant failed to establish a
partnership during the period between 1931 and 1939,
either by direct proof or inferentially. This likewise
disposes of appellant's assignments III and IV.

Assignment V is as follows:

"The court erred in not making a proper dis-
tribution of the partnership money, property and
affairs between the plaintiff and the defendant
Marion M. Powell from 1939 to 1945."

■ This assignment upon its face seems to challenge
the entire accounting from January 1939 to 1945. How-
ever, further consideration of appellant's contentions
based upon this assignment discloses that it is not
contended that the entire accounting is erroneous. The
real point of this assignment seems to be that the
court should have charged respondent individually,
rather than the partnership, with the amount of the
mortgage against the Moro Ranch. In order to cor-
rectly understand this issue, it is necessary to further
consider the manner and method employed by the
parties in financing the purchase of the Burres Ranch.

The formation of the admitted partnership and the
purchase of the Burres Ranch were simultaneous. At
that time the indebtedness on the Moro Ranch had been
reduced to $10,018.55. There was a growing crop
thereon. The year before they had produced 22,000

bushels of wheat, against which they had secured government loans amounting to $9,000, leaving a substantial equity therein. At the time, namely, January 1939, they had not collected their 1938 government allotment, amounting to $1,275.95. There was money coming from custom work (the amount is not disclosed). The loan on the Moro Ranch was increased to $21,000. Respondent turned in the equity in her home in Portland for $4,850. They assumed a mortgage on the Burres Ranch of $28,912.99 and gave Burres personal notes for $16,237.01, payable $3,000 per year. All monies from all these sources were used to make this deal and start the new operation. Respondent testified positively that while she was using her Moro Ranch (securing the additional loan thereon) to assist in making the Burres deal, that it was definitely agreed that this was a mere accommodation to the partnership, and that, as between the parties, her ranch was to be considered clear of all encumbrances.

She testified:

"Q Mrs. Powell, it is in evidence here that at the time you say you formed this partnership in 1939 that the balance of your mortgage was slightly in excess of ten thousand dollars; now, did you have any discussion with your son in regard to the crop that was on your land and turning in your house on the purchase price with relation to the balance of that mortgage?

"A Yes, that is one reason we thought we could buy land is because we had crop enough growing to take care of a mortgage that remained on my ranch.

"Q The turning in of the house and the crop that was on there, was that used to balance your mortgage in any way?

"A It more than balanced it, because the crop was sufficient to do it. In making the deal, though, I turned my house in too.

"Q The understanding was, the, that your ranch was to be considered clear, as clear?

"A Yes.

"Q At that time?

"A Yes.

"Q In consideration of the crop and your home being on there?

"A Yes, indeed so; it was more than cleared by that."

This is denied by appellant, and it is asserted in his behalf that the record discloses that the 1939 crop was insufficient to pay this balance on the Moro Ranch mortgage. It is true that the 1939 crop was a very poor crop. In fact, the record discloses that 1939 was the driest season in that county since 1911. However, this testimony must be considered and interpreted from the standpoint of conditions as they existed and seemed to the parties at the time. In this connection it will be remembered that in 1938 they had produced 22,000 bushels of wheat. Prices were looking better. They were very optimistic. In fact, that is what led to the purchase of the Burres Ranch. Considering all these circumstances and conditions, we cannot say that the trial court erred in ruling that the evidence preponderated in favor of respondent upon this issue. Furthermore, as we have pointed out above, the parties themselves in their contract for the sale of the Burres Ranch provided that the purchaser should secure from the mortgage company, a complete release of the mortgage upon respondent's place, and deliver the same to her. This was a confirmation of the agreement to which respondent testified.

Again, by this assignment, appellant complains because the court disallowed his claim for $1,050 profit made upon the wheat exchange, and $1,596.51 rental

received from the partnership trucks. For the reasons given in connection with our disposal of appellant's assignment VI, the court was right in disallowing these items.

Assignment VI is as follows:

"The court erred in not allowing to Marion M. Powell the proceeds and profits of his earnings outside of the partnership."

■ It is contended in this connection that during the period from 1931 to 1938, inclusive, appellant earned by what is called outside work $10,501.08; that, while farming was not very profitable during this time, Marion M. Powell reduced the Moro Ranch mortgage $11,000, reduced the mortgage on the Portland home $2,500, paid a judgment to Meier & Frank for $1,091, purchased machinery and equipment for which he paid $6,624.22; that he deposited in the farm fund during this time $1,525.48 derived from operating part of his father's land; that he had worked hard, long hours, exchanging work, borrowing, renting, and making and working for equipment, so that the operation could be maintained; and that, by and large, he had done an excellent piece of work. We hasten to agree that appellant's accomplishments were outstanding—in fact, almost miraculous. They were achieved against obstacles that to many would seem unsurmountable. He is to be highly commended. But what motivated these efforts upon his part? Was it family pride? Was it the hope of inheritance? Was it a feeling of responsibility for this mortgage? We have already pointed out that respondent says that this outside work was part of the agreement. Again, a careful analysis of this item discloses that it is not so one-sided as appellant's statement thereof would indicate. Most of these

outside earnings came from plowing, harrowing, seeding and harvesting. The equipment used came principally from money borrowed upon crops. The expenses of the outside work were paid out of the operational fund. No segregation has been made. Without such segregation, how could an allowance be made? We are convinced that the work was done as originally planned —to help save the farm from the mortgage. That it should now be paid for is inconsistent with every position that appellant has taken. The trial court was right in disallowing this item.

■ Again, it is contended by appellant that from 1939 to 1945 he performed outside work amounting to $30,098.89. It was partnership machinery and partnership capital and one of the partners that earned these returns. No partner can thus profit at the expense of the partnership. § 79-404, O. C. L. A., *Dusenberry v. Horning,* 56 Or. 210, 216, 106 P. 1019; 47 C. J. 793, 794, and cases cited in note 69.

Counsel for appellant, in support of their position in connection with this assignment state: "It would seem unconscionable to deny this hard-working and resourceful son any benefit from his remunerative labors." It must, of course, be conceded that "the laborer is worthy of his hire." In this case, he has been well compensated. The partnership made an operational profit of $85,350.33, plus the unsold portion of the 1944 crops, the entire expense of which had been paid, and plus the profits derived from the 1945, 1946 and 1947 crops harvested by the receiver. In addition to this, the Burres Ranch and the accumulated equipment was sold, pending this litigation, at a substantial profit. Neither partner has much about which to complain from this standpoint.

■ We shall now give consideration to appellant's assignment I, wherein he complains of the refusal of the court to permit him to file a second amended answer. No formal application was made for this amendment. No amended pleading was tendered. There is, however, in the record considerable discussion regarding the matter, and, from this we learn, that appellant desired to abandon his contention that there was a partnership during the period of time from 1931 to 1938, inclusive, and in lieu thereof allege an agreement upon the part of respondent to convey to him, appellant, the Moro Ranch in consideration of his support of respondent during the remainder of her lifetime, and to request, by appropriate prayer, that the court grant specific performance of this contract.

> "In order to secure leave to amend, it is usually necessary to make formal application to the court, which it has been held should be unconditional, setting forth specifically the amendment proposed or presenting a copy of the desired amendment." 49 C. J. 542, § 727.

*Hersey v. Gegenheimer,* 116 Or. 464, 241 P. 976.

However, since the trial court did not require the appellant to conform to this practice, but considered the matter upon its merits, we shall do likewise.

Appellant contends that the proposed amendment did not change the "cause of suit or defense," and cites in support of this contention *Elliott v. Mosgrove,* 162 Or. 507, 533, 535, 91 P. (2d) 852, 93 P. (2d) 1070. The case does not sustain his position. In that case there was involved a claim against the executor of the estate of Thomas H. Mosgrove for $5,000, which it was alleged had been collected on a promissory note by the said Thomas H. Mosgrove, as trustee, during his life-

time. After both sides had rested, plaintiff was permitted to amend by adding this sentence: "Or that the said Thomas H. Mosgrove could by the exercise of reasonable diligence have collected in full said promissory note." It was still a proceeding to collect the $5,000 but on a different theory. The cause of suit was the same. *Richardson v. Investment Company*, 124 Or. 569, 571, 264 P. 458, 265 P. 1117.

We think it must be conceded that this proposed amendment would have materially changed the issue. A suit for a dissolution of an alleged partnership differs widely from a suit for specific performance of an alleged contract wholly inconsistent with such relationship. But appellant contends that, since it was offered to conform to the proof which had been received without objection, it should have been allowed. On the other hand, it is contended by respondent that objection could not have been made to the testimony, because it was given in answer to questions as to what the agreement was between the parties. It will be remembered that the answer upon which this case was tried alleged a partnership as of this date, namely, 1931. This was denied by the reply. The question eliciting this proof was: "During that period of time, what understanding, if any, did you and your mother have about the farming of that place?" Under the issues as then made by the pleadings, the question was perfectly proper. No trial lawyer who conceives it his duty to assist the trial court to obtain all the facts would even think of making any objection. Any objection which could have been made must of necessity have been overruled. Certainly counsel for respondent did not know, and we think it doubtful if counsel for appellant knew, that appellant intended to repudiate his own answer and

inject a new and wholly foreign issue into the case, by his answer to this question.

Section 1-1006, O. C. L. A., provides:

"The court may, at any time before trial, in furtherance of justice, and upon such terms as may be proper, allow any pleading or proceeding to be amended by adding the name of a party, or other allegation material to the cause; and in like manner and for like reasons, it may, at any time before the cause is submitted, allow such pleading or proceeding to be amended, by striking out the name of any party, or by correcting a mistake in the name of a party, or a mistake in any other respect, or when the amendment *does not substantially change the cause of action or defense*, by conforming the pleading or proceeding to the facts proved." (Italics supplied.)

 The court was right in thus denying the application. Moreover, we might add that the proof to which reference has been made is wholly insufficient to justify this court, or any other court, in granting specific performance. *Brennen v. Derby*, 124 Or. 574, 581, 265 P. 425; *Roardman v. Harding*, 63 Or. 122, 126 P. 993; *Farrin v. Matthews*, 62 Or. 517, 124 P. 675, 41 L. R. A., N. S. 184; *Losey v. O'Hair*, 160 Or. 63, 73, 83 P. (2d) 493; *Cooper v. Colson*, 66 N. J. Eq. 328, 58 A. 337, 105 Am. St. Rep. 660. See also note in 101 A. L. R. 923, 1104.

Having disposed of appellant's contentions, we shall now give consideration to respondent's cross-appeal. She makes but one assignment as follows:

"The Court erred in holding that the farming of the 100 acres rented from C. L. Powell during the years 1939 through 1944 was not a partnership operation and in crediting the defendant's drawing account with the moneys received from the sale of grain harvested off the C. L. Powell lands."

In disposing of this contention, the trial court said:

"After careful consideration the Court has credited the Defendant's drawing account with the monies received from the sale of grain harvested off the Chas. L. Powell lands based upon the following reasons: In 1936 Mr. Chas. L. Powell entered into a lease with his son, the Defendant, whereby he leased 100 acres of land which adjoin the "Moro Ranch" on the basis of a one-third rental. Defendant cropped these lands in 1937 and 1938 and still held the lease in 1939 at the date of the commencement of the partnership, no mention of its becoming a part of the partnership assets appears in evidence, no assignment of the lease was ever made to the partnership, and it remained an individual transaction between the father and son throughout all of the term. In Paragraph IV of Plaintiff's Complaint it is alleged that the purposes of the partnership were the farming of the "Moro Ranch" and of any other lands *acquired* by the partnership, meaning the "Burres Ranch", but no mention is made of any lands which should be leased. While it is the law that "every partner must account to the partnership for any benefit, and hold as Trustee for it any profits derived by him *without the consent of the other partners* from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property * * * ." § 79-404, O. C. L. A. The Court after careful consideration reaches the conclusion that this particular lease does not fall within the above quoted rule. The Plaintiff was fully informed of its existence from the beginning; she knew that her son had taken a crop off the 100 acres in 1937, and again in 1938; she knew of the lease being in full force and effect at the date of the commencement of the partnership; and she acquiesced in the use of the partnership machinery during the years 1940, 1942 and 1944. The lease was in no sense competitive with the partnership. It differed entirely

from the outside contract work which might be performed by the use of the partnership equipment, which was clearly understood to be a part of the partnership operations, and which as shown by the Accounts submitted proved to be a very valuable source of income for the partnership and all derived by the Defendant's sole efforts, but the lease was a private matter between father and son, the terms of which were known to and acquiesced in by the mother; a careful re-reading of the testimony fails to disclose any statement on the part of the Plaintiff that she claimed this lease as an asset of the partnership, while the Defendant's testimony in regard to the whole transaction stands uncontradicted.''

 A careful analysis of the record convinces us that the trial court was eminently correct. The law does not prohibit a partner from engaging in enterprises in his own behalf during the period that he is a member of a firm, provided he acts in good faith toward the other partners. *Shrader v. Downing,* 79 Wash. 476, 140 P. 558, 52 L. R. A., N. S. 389 and note; 40 Am. Jur., Partnership, § 132, page 220. Section 79-404, O. C. L. A., only requires that an accounting be made by a partner for ''* * * profits derived by him without the consent of the other partners from any transaction connected with the * * * conduct * * * of the partnership or from any use by him of its property.'' As the trial court points out, the transaction involved was not connected with the conduct of the partnership, and the use of the partnership equipment by appellant was by and with the consent of the respondent. The court might have added that respondent had had the benefit of this operation during 1937 and 1938 when there was no partnership, and the plainest and most fundamental principles of equity dictate the same result.

The record in this case is long, cumbersome and confusing. The parties kept no records. Their memories are very inaccurate. The attorneys on both sides have been of great assistance to the court, in their arduous efforts to reconstruct and build up a record of these many transactions, by the use of bank records, checks, correspondence, statements rendered by the mortgage company and other concerns through which the parties did business. But even these sources proved uncertain, inaccurate and confusing. The trial court took this mass of material and, it might almost be said, brought order out of chaos. At least the court was able, as he put it,

"After repeated attempts to strike a balance from the figures submitted in the various segregation sheets it became necessary to compare and check each entry in the different banks and to set up individual accounts relative to all the transactions also to compare and analyze each of the bank statements introduced and give effect to the innumerable adjusting entries necessary to place the partners in true position. This proved in the long run not only to be a very formidable task but one which no one person could possibly do alone. To insure accuracy in every detail the Court associated with Pattullo & Wilson, a well known firm of Certified Public Accountants in Portland, Oregon, and after a period of twelve days of rechecking each individual item, and checking the adjusting entries required to be made, the different bank balances were reconciled, and all necessary entries made to reflect the true position of the partners."

The court then sets out in detail a complete statement of the account between the partners. It is not deemed necessary to repeat that statement here. Suffice it to say that the account was so well cast that the only exceptions taken to it are the ones noted above,

all of which were correctly determined. The trial court's painstaking efforts, in scrutinizing, analyzing, rearranging, readjusting, reconciling, harmonizing and balancing this mass of disconnected, inaccurately identified, inadequately supported statements, checks and accounts, merit high commendation.

The decree based thereon ought to be and is hereby affirmed. Inasmuch as both respondent and appellant appealed from said decree, neither shall recover costs or disbursements in this court.

Submitted on Petition for Rehearing filed September 25, 1947, by respondent-cross appellant.

*Celia L. Gavin* of The Dalles and *Ralph E. Moody* of Salem (Gavin & Gavin, of The Dalles, and Ralph E. Moody, of Salem, on brief), for appellants.

*E. F. Bernard* of Portland (Collier & Bernard and Wm. K. Shepherd, all of Portland, on brief), for respondent-cross appellant.

Before ROSSMAN, Chief Justice, and LUSK, BELT, HAY and WINSLOW, Justices.

WINSLOW, J. (Pro Tempore)

This matter is before us upon petition for rehearing. Our attention is called to the statement in the opinion rendered, to the effect that the partnership made a profit of the profits derived from the 1946 and 1947 crops harvested by the receiver. This court is not infallible and is ever willing and anxious to correct its own errors. The statement referred to is erroneous and correction thereof is hereby made.

With this disposition of the matter, a rehearing is not necessary, and the petition is therefore denied.