Argued June 13, reversed June 27, on rehearing former decision
sustained December 5, 1950

## YOUNG *v.* NEILL ET AL.

220 P. (2d) 89
225 P. (2d) 66

162

*Otto J. Frohnmayer* argued the cause for appellant. On the brief were Neff & Frohnmayer, of Medford.

*Frank J. Van Dyke* argued the cause for respondent-cross appellant. On the brief were Van Dyke & Lombard, of Medford.

*George M. Roberts* and *Edward Branchfield* argued the cause for respondents. With them on the brief was G. W. Kellington, all of Medford.

Before LUSK, Chief Justice, and BELT, ROSSMAN, HAY and LATOURETTE, Justices.

LATOURETTE, J.

This is an appeal from a decree denying specific performance of an alleged lease of a grocery store in Ashland, Oregon, the terms and conditions thereof being embraced in a written, unsigned instrument. Plaintiff-appellant Young and her ex-husband Neill, re-

spondent-cross appellant, were the lessees, and the defendants-respondents McGee, husband and wife, were the lessors. Mr. Neill and Mrs. McGee are brother and sister; Mr. McGee is a minister of the gospel. Since Mrs. Young and Mr. Neill were married at the time of the transactions involved herein, we will hereinafter designate them as "the Neills."

The McGees were co-partners in a grocery business known as the "Boulevard Market" and owner as tenants by the entirety of the premises where the grocery business was located. About the middle of June 1946, they contemplated disposing of their business because of McGee's ill health. Negotiations were had between the parties, whereupon the Neills quit the business in which they were engaged and took possession of the grocery store, paying to the McGees the sum of $12,797.31 for the stock of goods and $1,000.00 for the goodwill of the business. A lease to the premises involved and a bill of sale covering the stock of goods were prepared by William Briggs, attorney for the McGees, at the instance of McGee, this lease being the one involved in this controversy. These documents were not signed by any of the parties but were delivered to the Neills who placed them in the safe in the store building. The Neills paid the McGees on a monthly basis as provided for in the written lease on the following terms: three per cent of the gross sales of the business each month up to $12,000.00, plus two per cent on all sales in excess of that amount.

■ The Neills were divorced in December 1946, and in July 1947, Mrs. McGee, who was very much exercised about the divorce, told Mrs. Neill that she should sell the business "because so many people were asking why we didn't get that mess out of there." The matter

continued until October 24, 1947, when the McGees served notice upon the Neills to quit the premises, claiming a tenancy from month to month. Thereupon, the Neills, in looking over their paper, found that the lease and bill of sale were unsigned. This suit was then brought to compel specific performance, the claim being that the unsigned lease was the lease actually entered into between the parties. The ex-husband Neill refused to join in the suit and was made a party defendant; however, he filed an answer which contained most of the allegations of the complaint and also asked for specific performance. The McGees answered and inter alia admitted the sale of the stock of goods at its inventory value of $12,797.31, plus an additional $1,000 for the goodwill of the business but denied that the parties ever agreed upon the terms of said lease, and alleged that said unsigned lease was null and void and of no effect. They alleged that the Neills' occupancy was based on a tenancy from month to month and asked that the tenancy be cancelled and that they be given possession of the real property. As a separate defense they alleged, among other things, that the Neills were estranged at the time of the culmination of the transaction and withheld knowledge of such estrangement from the McGees, and had they known of such estrangement, they would not have made the sale to the Neills nor allowed them to conduct the grocery business on said premises, and, therefore, they should be estopped from asserting that the McGees agreed to be bound by the terms of the alleged lease. This defense cannot be considered as the evidence shows the McGees had knowledge of the marital troubles between the Neills at the time the transaction was closed.

The McGees contend that this case falls within the statute of frauds, and, since the lease was unsigned, no evidence of its contents could be received. The Neills counter by contending that the case was taken out of the statute of frauds because of part performance, and that the McGees should be estopped to deny the validity of the lease.

■■ In Oregon a lease for more than one year is void unless it is in writing, however, equity will relieve a party from the effects of such statute where the lease can be shown to be clear, certain and unambiguous in its terms and where there is part performance on the part of the lessee, such as taking possession of the premises and payment of rental under the lease. *Wallace v. Scoggins,* 18 Or. 502, 21 P. 558. The statute of frauds was never designed to shield against the perpetration of a fraud.

■ There are three essential elements of a lease, namely, description of the property, duration of term and rental consideration. *Bevan v. Templeman et al,* 145 Or. 279, 289, 26 P. (2d) 775.

There is sharp conflict in the testimony of the witnesses concerning the lease, but on a close analysis of the evidence, we find that the same established the following facts: after discussions were had between the parties regarding the sale of the business, all four of the parties went to the Ashland branch of the First National Bank of Portland for the purpose of discussing the feasibility of the Neills obtaining a loan of $10,000.00 to complete the deal. Mr. Wenner, manager of the bank, testified as follows:

"A. The main item which it was necessary for us to discuss was the matter of a lease. I was informed that they had a lease which would extend

over an indefinite period on a basis of three per cent of the gross, and I explained to them that would not be sufficient in this particular case, for the reason that that particular type of loan was based purely on income from the business, and that it was absolutely necessary for us to be assured that the operators would have a place in which to do business for at least six months longer than the term of our loan, which in this instance would be three years and six months. At that meeting they tentatively agreed to make it a five-year lease, and it was my understanding they were going down to Mr. Briggs' office to complete that either that same day or shortly thereafter, because my records indicate that I informed our loan production department definitely that there was a five-year lease on a three per cent gross basis.''

Discussion was had about the extent of the business which the McGees had done; whereupon McGee submitted to Wenner a profit and loss statement covering the years 1944 and 1945 and told Wenner ''* * * that they (the Neills) should have no difficulty in realizing that amount of income from the business which was potential.'' Thereupon McGee and Neill went to the office of William Briggs, attorney for the McGees, and asked him to draw a lease covering the premises involved. Mr. Briggs testified as follows:

''Q. Just tell the Court what conversation you had with Mr. McGee and Mr. Neill at that time as nearly as you can remember.

''A. Well, Mr. McGee and Mr. Neill came in the office, and Mr. McGee told me that he was planning on selling the grocery store to Dick and Mollie—

''Q. That's Mr. Neill and Mrs. Young?

''A. Yes; and that they wanted a lease prepared; and Everett—that's Mr. McGee—had a little memorandum of the various points he wanted in the

lease, and we discussed it, and I took notes of what the provisions were that he was especially interested in, and I drew the lease on that basis. That's about all there is to it.

"Q. Did you recall having any discussion relative to how the percentage would be checked on by Mr. McGee?

"A. Yes. There was a little something said about that. On those percentage leases we sometimes put in a clause about access to the books, and Mr. McGee said 'Well, I am dealing with Dick—Mr. and Mrs. Neill—and there isn't any necessity of a lot of complicated provisions on that, because he indicated he trusted them thoroughly on that. I did, however, put in a short provision that they could check the income tax returns.

"*    *    *    *

"Q. Mr. Briggs, I am handing you Plaintiff's Exhibit 'A'. I will ask you to state whether or not that is the lease which you prepared after your discussion with Mr. McGee and Mr. Neill?

"A. That's it.

"Q. Looking at the terms of that lease, Mr. Briggs, would you just take the first paragraph for example and tell the Court how it happened you put in the lease that it should be for a period of five years beginning July 1, 1946, and ending June 30, 1951?

"A. Just because I was told to; that's all.

"Q. And the description that it covered (reading) 'those certain premises known as the Boulevard Market at 842 Siskiyou Boulevard, City of Ashland, Jackson County, Oregon, together with all of the furniture, furnishings and store equipment pertaining thereto, but excepting that portion thereof which is now occupied by the Boulevard Market Butcher Shop and its equipment, on the terms, stipulations and conditions herein set forth and enumerated.' How did you get that description?

"A. Mr. McGee and Mr. Neill. Everett did most of the talking, however, as far as that is concerned.

"Q. With reference to paragraph two (reading) 'That the rental for said premises, which the first parties agree to accept and the second parties agree to pay, is a sum equivalent to three per cent on all gross sales of the grocery store operated in the leased premises up to $12,000 gross sales per month and two per cent on all gross sales per month in excess of $12,000.' How did you happen to put those provisions in the lease?

"A. Well, the parties told me to. That was their understanding.

"Q. And that the rentals should be paid on the 5th day of each and every month for the preceding month. Were you advised to put that provision in?

"A. That's correct.

"Q. With reference to paragraph three (reading) 'That the first parties shall at any time they so desire have a right to check the income tax returns of the second parties relative to the operation of said Boulevard Market and second parties' books of account in order to verify the amount paid as percentage rental hereunder.' At whose instance was that provision inserted in the lease?

"A. I suppose it was mainly at mine, because as I remember that provision there, there was some statement made by Mr. McGee that of course he wouldn't have to be as careful with somebody he knew and who was even part of the family as he would with somebody else.

"Q. The provision (reading) 'That the first parties agree to care for all necessary interior and exterior repairs and redecorations.' Why was that put in the lease?

"A. Because I was told to.

"Q. The next sentence (reading) 'As to repairs on equipment included in this lease second parties agree to defray the expense thereof, unless any of

such equipment becomes worn out or destroyed through no fault of the second parties', were you instructed to put in that provision?

"A. Yes; it was discussed. That's how it happens to be there.

"Q. Then the remainder of that clause (reading) 'in which case it shall be replaced with equipment of like quality and value by the first parties.' Was that their agreement?

"A. Yes. Mr. McGee and Mr. Neill said that they were to pay all of the expenses of the upkeep on the machinery and refrigerator and all that sort of thing. There was quite a lot of equipment there, but if it became worn out entirely, then Mr. McGee would replace it.

"Q. The next provision (reading) 'That the second parties agree to be responsible for any damage to the leased premises occurring through the negligence of themselves or their employees.' At whose suggestion was that included?

"A. I rather think that was more mine than theirs probably.

"Q. Will you look at paragraph six and tell us whether you were instructed to put in that provision?

"A. I was.

"Q. With reference to paragraph seven, was there any discussion about the terms of that paragraph?

"A. I don't remember any.

"Q. You included it because you felt it was a proper term of the lease?

"A. That's correct.

"Q. With reference to paragraph eight, did you have a discussion with the parties as to that right of option?

"A. Yes; I was specifically told in regard to that.

"Q. Now, as to paragraph nine, did you have any definite discussion on that point?

"A. No; it is just a stock clause.

"Q. In connection with this transaction, Mr. Briggs, were you asked to prepare a bill of sale of the stock of merchandise, and so forth?

"A. I imagine so.

"Q. I am handing you what's been marked Plaintiff's Exhibit 'B'. I will ask you to state whether that bill of sale was drawn in your office.

"A. I think it was.

"Q. Mr. Briggs, do you know who took delivery of these two exhibits, 'A' and 'B', the lease and bill of sale we have been talking about? Who got them from your office, or how did they get out of your office.

"A. Well, of course I don't know who took delivery because I wasn't there at that time, but from my office my son-in-law Mr. Ritter took them out and delivered them to the parties out there. Of course that's all I know. I know they had been promised for that day. I can't just remember what it was, but I knew they wanted them, and he happened to come in the office and I asked him if he would take them out, and he did, and that's all I know about it.

"Q. Do you know what day it was they were taken out?

"A. No.

"Q. When Mr. McGee was in the office with Mr. Neill, did he make a statement to you that he would see to their being executed?

"A. Yes; he was going to attend to that. He asked, I think, if they required notarization with reference to leases, and I said no, but he said he would tend to having them signed. It wouldn't have made much difference anyway, because they could have come in and had them notarized afterward."

When handed a copy of the lease in question, McGee admitted that that was the lease Mr. Briggs prepared and delivered. When asked about the terms of the lease, McGee further testified: "As I recall, we didn't discuss a great deal about it. I left most of that to the lawyer, feeling that he was representing me. We did discuss, though, the amount of income I should receive—the three per cent and two per cent, and we discussed that and concerning the length of the lease."

The Neills continued to occupy the premises, pay the rentals as provided for in the lease, and everything progressed satisfactorily until Mrs. McGee learned of the Neills' divorce and then claimed that she had not signed the lease because it did not contain a clause prohibiting the Neills from assigning the same, and thereupon ordered the Neills out.

■ From the foregoing, it clearly appears that the lease drawn by attorney Briggs was clear, certain and unambiguous in its terms, that it contained all the elements of a lease, i.e., description of the property, duration of term and rental consideration, that the lease as drawn was drawn at the behest of the Neills and McGee, and that there was part performance on the part of the lessees in taking possession of the premises and paying rental as called for in the lease. It is clear, therefore, that McGee should be held and bound by the terms of such lease.

It is next contended that even though we should find McGee bound by the written lease, Mrs. McGee could not be held because McGee had no authority to act for her. In regard to this matter, the following occurred at the trial when Mrs. McGee was being questioned:

"Q. However, knowing the provisions of this lease, Plaintiff's Exhibit 'A', which you stated you

read, you nevertheless accepted the rent payments under it, did you not?

"A. Yes."

She further testified that she and her husband consulted each other freely in connection with their business affairs. Although the McGees were partners, Mrs. McGee permitted Mr. McGee to conduct the grocery business in his own name, he having filed an assumed business name certificate with the county clerk of Jackson county showing that he was the sole owner of the grocery business known as the "Boulevard Market." A portion of the building owned by the McGees was leased out to a man by the name of Arney for a butcher shop under a written lease for a three-year period. McGee alone signed this lease, with the knowledge and consent of Mrs. McGee. In this regard McGee testified as follows:

"Q. I note, Mr. McGee, that this lease was for a term which commenced September 18, 1944, and ran to September 18, 1947; that's correct, is it not?

"A. Yes.

"Q. And Mr. Arney actually occupied the premises under this lease and paid rental pursuant thereto?

"A. Yes.

" *  *  *

"Q. Did you have any authority from Mrs. Mc-Gee to execute that lease and bind her?

"A. No written authority.

"Q. What authority did you have?

"A. I used my own signature. I often sign papers for the both of us, the same as I sign checks in the store representing the two of us.

"Q. In other words, she left it a good deal to your judgment in regard to these matters, is that correct?

"A. Yes.

"Q. And you had for some time, I presume, been doing business in that way?

"A. Yes."

■ An agency may be implied from attending circumstances and the apparent relations and conduct of the parties. *Boise-Payette Lumber Co. v. Dominican Sisters,* 102 Or. 314, 325, 202 P. 554.

■ Where the issue is whether a husband was the agent of his wife, with the authority to act for her, evidence that he had previously acted for her in the same type of transaction is admissible. *Hawkins v. Windhorst,* 77 Kan. 674, 96 P. 48; *Sidle v. Kaufman et al.,* 345 Pa. 549, 29 A. (2d) 77; 41 C. J. S., 552 § 74; Restatement, Agency, 65 § 22.

■ The fact of the close relationship between the McGees; the fact that Mrs. McGee took part in the loan application at the bank and helped the Neills obtain a loan of $10,000.00 based on the assumption that there would be a lease; the fact that she had permitted her husband to conduct the business in his own name; the fact that she had permitted him to lease the butcher shop in his own name; the fact that she accepted rentals under the lease; the fact that she had knowledge of the lease as drawn by Briggs and did not object to the same until becoming apprised of the Neills' divorce, and other facts adduced by the evidence, impel us to hold that Mrs. McGee was bound by the terms of the lease, and that both she and her husband are estopped to deny the validity of the same. This court, speaking through the late Mr. Justice KELLY in *Marshall v. Wilson,* 175 Or. 506, 518, 154 P. (2d) 547, said:

"This doctrine of equitable estoppel or estoppel *in pais* is that a person may be precluded by his act or conduct, or silence when it was his duty to speak,

from asserting a right which he otherwise would have had. The one invoking such doctrine must show that he was entitled to rely upon such conduct, action or silence, that he acted thereupon and would be prejudiced if the doctrine of estoppel were not applied.''

■ At the conclusion of the conference between attorney Briggs, Neill and McGee, concerning the drawing of the lease, it will be remembered that McGee told Briggs that he would attend to having the lease and bill of sale signed. This he failed to do, and as equity regards as done that which ought to be done, this court will compel specific performance in strict accordance with the original intention and agreement of the parties.

The decree of the lower court will be reversed, and a decree will be entered in accordance with the relief prayed for by appellant Young and respondent-cross appellant Neill in their respective pleadings.

### On Rehearing

In Banc.

*Otto J. Frohnmayer* argued the cause for appellant. On the brief were Neff, Frohnmayer & Lowry, of Medford.

*Frank J. Van Dyke* argued the cause for respondent-cross appellant. On the brief were Van Dyke & Lombard, of Medford.

*George M. Roberts* argued the cause for respondents. With him on the brief were G. W. Kellington and Edward Branchfield, all of Medford.

TOOZE, J.

Respondents have filed a petition for rehearing based on the following grounds:

"I

"The court erred in holding that the taking of possession of the premises and the payment of rental is sufficient part performance to take a lease for more than one year outside the operation of the Statute of Frauds.

"II

"The court erred in holding that Everett H. McGee was the authorized agent of Donzella McGee for the purpose of entering into a lease, in the absence of proof of written authority as required by the Statute of Frauds.

"III

"The court erred in holding that the parties had agreed upon the terms of a lease.

"IV

"The court erred in holding that respondents McGee are estopped to deny the validity of the lease which is the subject matter hereof."

Referring to respondents' first ground above, it is stated in the accompanying brief that: "The present decision introduces an element of great uncertainty into the law relative to the application of the Statute of Frauds." This claim is based on the language of the court (*Young v. Neill*, 50 Or. Adv. Sh. 957, 960, 220 P. (2d) 89) where it is stated:

"In Oregon a lease for more than one year is void unless it is in writing however, equity will relieve a party from the effects of such statute where the lease can be shown to be clear, certain and unambiguous in its terms and where there is part performance on the part of the lessee, such as taking possession of the premises and payment of rental under the lease. Wallace v. Scoggins, 18

Or. 502, 21 P. 558. The statute of frauds was never designed to shield against the perpetration of a fraud.''

In their brief, the respondents state:

"While there are a number of Oregon cases holding that taking possession and payment of part of the purchase price operates to take a contract for the *sale* of real property out of the Statute of Frauds, the Oregon cases relating to *leases* require more. The distinction is apparently based upon the fact that in a contract of sale, the taking of possession is notice to the world that the newcomer has an equity in the property, and his possession is adverse to the former ownership. No such distinction exists where one takes possession as a tenant.''

A careful examination of the Oregon decisions does not disclose that this court has directly made any distinction between sales and leases in the respects under discussion. Mr. Pomeroy makes no distinction. In Pomeroy, Specific Performance of Contracts (3d ed.) 283, § 115, it is stated:

"Possession alone of land, under a verbal contract, when delivered to the vendee or *lessee,* or taken by him with the consent of the vendor or lessor, or with the knowledge which implies such consent, is an act of part performance which takes the case out of the statute of frauds, even without the additional circumstances of the payment of consideration, or the making of improvements. This rule is settled by an overwhelming weight of authority in England and in this country * * *.'' (Italics ours.)

Mr. Story reaches the same conclusion. In 2 Story, Equity Jurisprudence (14th ed.) 430, § 1049, it is stated as follows:

"But if the possession be delivered and obtained solely under the contract, or if in case of a tenancy

the nature of the holding be different from the original tenancy, as by the payment of a higher rent, or by other unequivocal circumstances referable solely and exclusively to the contract, there the possession may take the case out of the statute.''

The statements of both these authorities are commented upon with approval by the late Mr. Justice RAND in *Dunis v. Director et al.,* 121 Or. 500, 255 P. 474.

■ The mere taking of possession of premises and the payment of rent may not in all cases be such part performance of an oral lease as to take the case out from the operation of the Statute of Frauds and permit oral evidence to establish the agreement of the parties, nevertheless it is well established that such taking of possession and payment of rent in conjunction with other facts and circumstances may be sufficient. Each case must necessarily depend upon its own peculiar facts and circumstances, and it is, of course, impossible to lay down a rule that will fit all situations that may arise. In some cases, the placing of substantial improvements upon the premises by the lessee, or the making of repairs, in addition to possession and payment of rent, have been deemed sufficient part performance. *Dunis v. Director et al.,* supra; *Friberg v. Bjelland,* 95 Or. 320, 186 P. 1113; *West v. Washington Railway Co.,* 49 Or. 436, 90 P. 666; *Wallace v. Scoggins,* 18 Or. 502, 21 P. 558. But whether or not there has been such part performance does not depend solely upon whether or not improvements have been made.

In *Dunis v. Director et al.,* supra, at page 507, this court said:

"It is settled law in this state that where one, in reliance upon the terms of a parol agreement, has entered into possession of real property as

lessee with the acquiescence of his lessor and has incurred expenses and changed his circumstances and condition to such an extent that refusal on the part of the lessor to perform would operate as a fraud on the rights of the lessee, such acts constitute part performance of the parol agreement and take the case out of the operation of the statute of frauds.''

■ Where one party in addition to taking possession of the premises and paying the rent, performs other acts pursuant to the terms of the oral lease and directly referable thereto, such as materially changing his position to his disadvantage, incurring substantial expenses, making substantial improvements or repairs to the premises, or otherwise doing something which he would not have done but for the agreement and which would result in substantial injury to himself if the other party were permitted to hide behind the statute of frauds and disavow the same, and when the other party has received and enjoyed the benefits of the oral lease, equity will step in and compel specific performance, the other party being estopped to set up the statute as a defense.

The foundation of this doctrine is fraud; not necessarily an antecedent or positive fraud, but a fraud inhering in the consequence of this setting up the statute. It applies where to permit the defense would be inequitable and unconscionable. *Seymour v. Oelrichs,* 156 Cal. 782, 106 P. 88, 134 Am. St. Rep. 154, and note; Pomeroy, Specific Performance of Contracts (2d ed.), §§ 104, 107; Pomeroy, Specific Performance of Contracts (3d ed.), § 96; Story, Equity Jurisprudence (3d ed.), § 1409, et seq.; 49 Am. Jur., Statute of Frauds, §§ 578, 580.

It must be remembered in the case at bar that these

parties were not dealing at arm's length. There was a very close relationship existing between them, with resulting trust and confidence in each other. As so often happens—and, unfortunately, in too many instances—the parties, relying upon such mutual trust and confidence, neglected to give attention to strict legal and business requirements which they otherwise would have done had they been dealing with strangers. Obviously, it would be grossly inequitable and unconscionable to permit one who has received benefits from such trust to betray the same to the serious disadvantage of the other.

In this case, the sale and purchase of the stock of merchandise, the payment of a substantial consideration for the goodwill of a going business, which included the transfer of the assumed name, the leasing of the premises for a term of five years with an option of renewal, the borrowing of the money at the bank with which to complete the purchase, the use of the entire marital savings of the purchasers in making the purchase, the severance of employment by one of the purchasers in order to conduct the business purchased, were all integral parts of a single transaction, each part dependent upon the others.

In taking possession of the stock of merchandise and conducting the business, in the occupancy of the premises, in the manner and time of paying rental, in taking care of the expenses of the utilities, water and lights, in the redecorating of the store itself—in fact, in everything done, the parties performed in strict accordance with the terms of the unsigned lease prepared by respondents' attorney, Mr. Briggs, at the instance and under the direction of the respondent Everett McGee. The respondent McGee so admitted.

Everything done by the parties was directly in pursuance of and referable to the oral lease.

When we speak of acts of part performance as being done in pursuance of and directly referable to an oral lease, we do not wish to be understood as meaning acts referable to any oral lease, but to such acts only as are directly referable to an oral lease for a term of more than one year.

By operating under this form of lease for approximately fifteen months without objection, accepting its benefits and obligations, respondents must be deemed to have acquiesced in and ratified the same as a true expression of their actual agreement, and by their silence when it was their duty to speak if they were not satisfied, they are estopped now to take a position inconsistent with their conduct, for to permit them to do so, would result in gross injustice and be wholly inequitable and unconscionable.

We have given consideration to the other points raised in the petition for rehearing but do not deem it necessary to further discuss them inasmuch as we adhere to what was said in the original opinion.

We adhere to our former decision.