Argued November 15, reversed with directions December 5, 1951,
petition for rehearing denied January 9, 1952

# MEADS *v.* STOTT

238 P. 2d 256
239 P. 2d 594

*U. S. Balentine,* of Klamath Falls, argued the cause for appellant. With him on the brief was Mark Simons, of Klamath Falls.

*R. B. Maxwell* argued the cause for respondent. On the brief were Farrens & Maxwell, and W. J. Moshofsky, all of Klamath Falls.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK and TOOZE, Justices.

## TOOZE, J.

This is a suit by Frank R. Meads, as plaintiff, against Manning C. Stott, as defendant, for the dissolution of an alleged partnership and for an accounting.

Plaintiff, by his complaint, alleges that during the months of November and December, 1944, he and defendant entered into a copartnership agreement for the conduct of a general outdoor advertising business, to begin January 2, 1945; that said business was conducted under the assumed name of "United Outdoor Advertising Company"; that during the entire existence of the copartnership, all books, records, papers and other documents relating to the business were under defendant's exclusive custody and control; that defendant, over plaintiff's protest, had withdrawn large sums of money from the partnership account and credited the same to his own personal account; that plaintiff had demanded an accounting and permission to examine the books of the copartnership, which requests were denied by defendant. Plaintiff prays for a dissolution of the partnership, for an accounting, for the sale of the partnership assets, and, after liabilities are paid, for a division of the proceeds between the partners, and for the appointment of a receiver.

Defendant, by his answer, generally denies all the allegations of the complaint. Affirmatively, he pleads that the relationship between himself and plaintiff was

that of employer and employe, and that he terminated plaintiff's employment on February 10, 1950. By way of cross-complaint, defendant alleges that, since plaintiff's discharge from employment, he, the plaintiff, has continued to act as "an employee, or partner or other interested party in defendant's business being conducted as United Outdoor Advertising Company, and has interferred [sic] with the conduct of such business by defendant," to defendant's injury. Defendant prays for a restraining order against plaintiff. Plaintiff replied to defendant's affirmative defense and answered the cross-complaint, denying all allegations thereof inconsistent with or contradictory to the allegations of his complaint.

The trial court found that the relationship between plaintiff and defendant was that of employe and employer, and not of partnership; that plaintiff had been discharged from his employment, but had continued to claim an interest in the business as a partner, and had interfered with defendant in the conduct of such business, to defendant's injury. The court entered a decree dismissing plaintiff's complaint with prejudice and granting to defendant a restraining order as prayed for in his answer. Plaintiff appeals.

The problem presented to us for solution is largely a factual one. There is but little dispute between the parties regarding the principles of law that are applicable. The whole case necessarily turns upon a determination of the question whether plaintiff and defendant were partners in the conduct of the business in question. If they were, then the trial court erred in denying plaintiff the relief prayed for in his complaint.

■ At the outset, it should be stated that there is a sharp dispute in the testimony as to whether or not

the parties entered into a copartnership agreement. It ensues, therefore, that in considering the record before us, we have kept in mind the well-established rule that, where the facts are disputed, the final determination of the trial judge in reference thereto is entitled to great weight. In all such cases this court is reluctant to disturb the trial court's finding in the absence of a showing that there has been a manifest abuse of discretion.

Aside from the fact of the existence or nonexistence of a partnership relation, there is little dispute in the evidence regarding the acts and conduct of the parties.

Plaintiff and defendant first became acquainted in 1935 or 1936, when both were employed by the Electric Products Company in Portland. About 1940, defendant opened an outdoor advertising business at Klamath Falls. He also engaged in photographic work, maintaining studios at Klamath Falls and Medford. During the war the outdoor advertising business did not prove successful, and in early 1945 its monthly income did not exceed $70. For approximately six months prior to January, 1945, plaintiff was employed by the Foster & Kleiser company at Medford. During 1944 plaintiff and defendant frequently visited each other, both in Medford and Klamath Falls.

As will hereafter be pointed out in more detail by quoting the testimony of plaintiff and defendant, plaintiff claimed that in November and December, 1944, he and defendant entered into an oral agreement of partnership for the conduct of the outdoor advertising business at Klamath Falls, each partner to own an undivided one-half interest therein. Defendant, to the contrary, contends that no partnership agreement ever was entered into. He maintains that what plaintiff insists constituted an agreement between the

parties was, in truth, merely a continuing offer to buy into the business, which he made to plaintiff, an offer which he asserts was never accepted by plaintiff. Defendant testified that he kept this offer open for plaintiff's acceptance at any time from January 2, 1945, until it was withdrawn on or about November 1, 1949. Based upon this contention, it is defendant's position that at all times between January 2, 1945, and February 10, 1950, the relationship existing between himself and plaintiff was simply that of employer and employe.

The undisputed evidence in the record discloses the following facts:

Plaintiff terminated his employment with the Foster & Kleiser company at Medford in late December, 1944, and on or about January 2, 1945, went to Klamath Falls, where he immediately assumed the active management of the business of United Outdoor Advertising Company, which company is hereafter referred to as "United." Plaintiff moved his family to Klamath Falls in April, 1945.

Plaintiff continued to manage the business of United from January 2, 1945, until this litigation was commenced on February 9, 1950, and claimed the right to the management thereof after suit was commenced. Under plaintiff's management, the business proved to be a success. From a gross income of less than $70 per month on January 2, 1945, the operations of United showed substantial increases in gross income each year thereafter; for example, in 1946 the gross income was $9,936; in 1947 it was $17,608.72; in 1948, $20,834.69 was received.

During the entire period in which plaintiff was associated with United, the defendant kept the books, records, and other documents pertaining to the business

and handled all finances. At first, defendant received a nominal salary of $20 per month for these services. This later was increased. Initially, plaintiff, as manager, received a monthly salary of $250, which also was increased later.

During the year 1945 the business of United was carried upon the books of defendant's studio, known as Bell Studio. In January, 1946, separate books were opened for the United, and, thereafter, all records were kept and business was conducted in the name of such company. In January, 1946, defendant opened a bank account for United in the Klamath Falls branch of the United States National Bank of Portland (Oregon), with directions to the bank to honor no checks other than those bearing the signatures of both plaintiff and defendant; these signatures were filed with the bank at the same time. This account was continued until November 1, 1949. Over the years and in order to facilitate the handling of the financial affairs of United by defendant, it was the practice of plaintiff from time to time to sign his name to a number of blank checks for use by defendant. The record is conclusive that until trouble developed between plaintiff and defendant in the fall of 1949, plaintiff reposed the utmost faith and confidence in defendant.

On December 20, 1945, just before the set of books was opened for United, defendant caused to be filed in the public records of Klamath county a certificate of assumed name for United Outdoor Advertising Company, with plaintiff named therein as sole owner. Defendant explained that he filed this certificate in plaintiff's name only, because of some financial difficulties he was having with creditors of Bell Studio and to make certain that the business of United would not be held for Bell Studio debts; he said that he did

this not only for his own protection, but also for plaintiff's.

Partnership income tax returns were filed with both the state and federal governments, showing plaintiff and defendant to be partners in the business of United. All of these income tax returns, including individual returns of the parties, were prepared by one William J. Owsley, a public accountant, upon information furnished him by defendant. Defendant told Owsley that plaintiff was his partner in the business.

Many income tax withholding statements were prepared upon information furnished by defendant and filed with the treasury department of the United States pursuant to law, showing amounts withheld from wages of employes of United. In all these statements United is designated as a partnership composed of M. C. Stott and Frank Meads. In none of them does the name of Frank Meads appear as an employe.

Defendant prepared and delivered to plaintiff annual reports in writing, showing in detail receipts and disbursements of the business of United and, in general, its financial condition. On these reports appear the interest charges of defendant on monies loaned by him for the benefit of the company.

Upon innumerable occasions over the years both plaintiff and defendant introduced each other to strangers as partners. At no time or place did either ever deny the existence of a partnership after January 2, 1945. Defendant never informed plaintiff that he did not consider him a partner in the business until on or about November 1, 1949. It was on November 1, 1949, that defendant, making use of one of the blank checks signed by plaintiff, withdrew from the bank all the funds of United and redeposited the same in

his own account. This was over plaintiff's protest. At that time, as plaintiff testified, the defendant said, "Well, he told me if I thought I had any interest in this business I could go to court, and get me an attorney, and get it if I was big enough." Plaintiff also testified to a later conversation with defendant as follows: "In the month of January, at the usual time I would normally have received a financial statement, I asked Mr. Stott where my financial statement was. He told me I did not get any. * * * He said I had been an employe all during the period and that if I was not happy I could quit. I told him I was not quitting, and that was not the original agreement, and he said: 'If you have any idea that it is anything otherwise you can secure for yourself the services of an attorney and get it if you can.' "

Plaintiff had no fixed time for reporting to work in the morning or for quitting at night. He worked long hours, sometimes, in excess of 14 hours in a single day. He also worked on some holidays. In fact, he came and went as he wished, being guided in that respect only by what he deemed to be the necessities of the business.

The record discloses other indicia of a partnership relation, but the foregoing statement is sufficient for the purposes of this opinion.

Defendant concedes that the acts and conduct of the parties were such that he could be and was bound to a partnership liability as to third persons, but he denies that the same established the existence of a partnership inter se.

As before observed, plaintiff claims that the partnership agreement upon which he acted grew out of a series of conferences between himself and defendant

during the months of November and December, 1944. As to the alleged agreement, plaintiff testified:

"Q. What was that agreement?

"A. It was an agreement we enter into a partnership for the purpose of projecting the United Outdoor Advertising Company; that Mr. Stott would make the necessary loans to the company in any amount sufficient to protect the business and an arbitrary inventory value was established; that I would be paid a guaranteed salary.

"Q. Now, just go back to the arbitrary inventory value: What inventory value was established in that agreement?

"A. Five thousand dollars.

"Q. Now, that was for the United Outdoor Advertising Company as it then existed?

"A. That is right.

"Q. You say you were to be paid a salary? How much salary were you to be paid?

"A. Three hundred and fifty dollars a month.

"Q. Was anything said about interest?

"A. Yes.

"Q. What was agreed on as the rate of interest?

"A. The rate of interest was to be 5 per-cent.

"Q. Was there anything agreed on in that agreement as to the time that this was to commence?

"A. Well, the first conference we held—

"Q. That is the one we are referring to.

"A. I was to maintain my job with Foster-Kleiser Company until approximately March.

"Q. What year?

"A. 1945.

"Q. Was there anything later agreed on the date you were to commence? If so, when?

"A. It was changed to start with the first of the year, 1945.

"Q. When was that change made?

"A. At a later conference held at my home.

"Q. Was there any agreement made in the original agreement as to what Mr. Stott was to receive in the way of wages?

"A. Yes.

"Q. What was that agreement?

"A. He was to maintain the books and to pay the necessary bills, to receive a matter of $20 a month for maintaining the books.

"Q. He was to receive $20 per month?

"A. That is right.

"Q. Now, did you agree to this?

"A. Yes.

"Q. It was fully agreed on between you and Mr. Stott at that time; is that correct?

"A. Yes.

"Q. How much were you to pay yourself, and how was it to be paid, according to that agreement?

"A. Well, I was to be paid a monthly salary, to be paid from funds—

"Q. You already testified to that. You said you reached an arbitrary agreement of $5,000 for this property?

"A. I was to purchase one-half interest in this United Outdoor Advertising Company for the sum of $2500, to be paid from the profits derived from the business.

"Q. Did you act on that agreement?

"A. Yes.

"Q. What did you do in pursuance to it?

"A. Well, I terminated my connection with Foster-Kleiser Company and came over here the second day of January and started to operate under it.

"Q. And when did you start operating?

"A. The second day of January.

"Q. Of what year?

"A. 1945.

"Q. And what has been done since that date down to the present time? Have you operated under it since that date?

"A. Yes.

"Q. What were your duties to be in reference to that partnership activity?

"A. I was to maintain all public relations locally, make all contacts, make all leases, perform physical work as much as I could, to hire the necessary extra help and generally maintain the business.

"Q. What was to be your interest in the business?

"A. Fifty per-cent of it."

Defendant's version of the transaction appears from his testimony as follows:

"Q. Now you did, however, prior to January 2, 1945, discuss his going into partnership with you, did you not?

"A. I discussed his employment, yes, and made him an offer.

"Q. What was that offer and where was it made?

"A. At the time he was working for Foster-Kleiser, and he came into the studio.

"Q. Will you tell us what studio, for the record, please?

"A. At 525 Main Street, the Bell Studio. And he told me he was working for Foster-Kleiser, and I told him, as a follow-up on the conversation we had in Medford in the previous June, now that the war was over I was going to again become active in the outdoor business and I was interested in hiring a man. Well, he said he would like to talk to me. That was a very rush season of the year and I put him off until late in December; I have forgotten the date, but I think it was a short time before Christmas. We went down to the hotel room and I asked him how much money he was getting with Foster-Kleiser. He said he was getting $150

a month; I told him I would give him $250 a month to come to work for me, if he thought he could do it. Here is what I wanted him to do: I wanted him to do all posting and all lease work and whatever sales work was necessary to do to call on local accounts, and the construction work, and I would hire the men to help him to do the construction work.

"Q. At this conversation was there any discussion about a partnership arrangement?

"A. Yes; and then after I had submitted this offer to him, and he told me he had asked Foster & Kleiser for $200 a month raise the first of January, and if he did not get it he would accept my job; and after that I told him that if he decided to come to work that I would make an offer to him whereby I would give him an opportunity to buy a half interest in the business, which was to be paid out of one half the profits of the business; that I would loan the company any and all money that it needed to operate at any time, and I would give it my time and services, for which I would charge only a small amount to start with.

"Q. What amount were you to charge to start with?

"A. It was $20 a month. That was for office expenses, bookkeeper, clerks' expenses, and the writing of letters, and so forth, plus services I rendered. I agreed that that would be so for the first two years so as to not overload the company with an overburden because it was sure to lose money the first year or two.

"* * * * * *

"Q. Did you and the plaintiff, Mr. Meads, during any of these discussions consider or discuss his beginning his functions over here in March 1st, 1945?

"A. No; if you refer to the offer I made to him—He asked me to reduce it to writing, which I did, and gave it to him. Now, at the time he had

his home still in Medford and would go home every weekend; so I gave that to him on Friday, and he read it over and I asked him how he liked it. He said that the interest rate was pretty high; the offer was for seven per-cent. I said, 'yes, but this is a hazardous business and I don't think you can borrow money for less than seven per-cent; further-more, it is paid out of one-half the profits of the business.' 'Well, he says, 'I'll take it home and discuss it with my wife,' which he did; and after he came back the following week I asked him how his wife liked it and he said, 'okay,' and he handed it back to me and it was not signed. Well, I did not ask him to sign it; I had made the offer, and it was up to him to accept it.

"Q. Now, you made an offer prior to his com-ing over here and going to work, did you not?

"A. Yes, orally.

"Q. And subsequent to the time you made him the offer he did come over and go to work; is that right?

"A. Yes.

"Q. *And he did exactly what he was supposed to do under the offer you made him; is that right?*

"A. *Yes.*

"Q. *And he continued to do that up until the first of this present year?*

"A. *Well, I could say yes, I think.*

"Q. In every particular in conformity to your offer you made him prior to January 2, 1945? He complied in every particular with what he was sup-posed to do under that offer you made him, did he not?

"A. No.

"Q. What did he fail to do under that offer you made him?

"A. Well, one thing he failed to do that this offer will prove it: his salary was to be $250 a month. Well, the second year he began to ask for

more money and he continued to ask for more money the third year; *and he had a lot of delinquent accounts around town and I was concerned about those and asked him about those. He said he could not live off the money he was getting, he wanted a raise; so I raised him to $300 a month.*

"Q. That was satisfactory with you, was it?

"A. Well, I felt that he could earn $300 a month if he would.

"Q. Now, let's go back to my original question, Mr. Stott: Prior to the second day of January, 1945, you made him a complete offer for him to acquire one-half interest in this business over here?

"A. Yes.

"Q. And, in that offer, you were to handle the financing of it; is that correct?

"A. Yes.

"Q. The advances? You were to handle the finances of the business, to advance money to promote the expansion of business and carry it on; is that correct?

"A. Yes.

"Q. That was in your offer?

"A. That is right.

"Q. And he was to devote his time in this, and your money, both the original amount you were to receive for the business, and what you advanced, was to be paid back out of the profits of the business?

"A. Plus interest at seven per-cent.

"Q. Then that was your offer to him, as I understand?

"A. Yes.

"Q. After you had made this offer he came over here and went to work, did he not?

"A. Yes.

"Q. And he continued to work up until very recently; is that right?

"A. That is correct.

"Q. Now, what was he supposed to do under that offer?

"A. He was supposed, first, to accept the offer, which he never did although it was kept open for him to accept over those [sic] period of years.

"Q. Was there any particular way he was to accept it?

"A. He refused to sign it.

"Q. No, under the original offer there, was there any particular way he was to accept the offer?

"A. He was to accept it by his signature to the offer.

"Q. I thought you said he is the one who asked you to reduce it to writing?

"A. He was the one who asked me to reduce it to writing.

"Q. Your offer did not include that a written agreement be made, did it?

"A. *My offer did not include that a written agreement be made,* but it was agreed that it be made and I made it, and then he refused to accept the offer after I made it, *by signing the agreement.*
"* * * * * *

"Q. Now, it is a fact that you orally agreed that he would be a partner, did you not?

"A. *It is a fact that we agreed as to the terms of the partnership,* yes, that he was to sign up but never did.

"Q. Did you not orally agree that he would be a partner?

"A. Under the oral agreement reduced to writing, yes, which he never signed." (All italics ours.)

It is noteworthy that there is only slight disagreement between the parties as to what should constitute the terms of a partnership agreement between them. *It was no part of their oral understanding that a formal written contract should be entered into.* This is a con-

dition that defendant later and alone imposed upon the transaction. At most, plaintiff simply requested that defendants *offer* be reduced to writing. It is reasonable to assume that plaintiff made such a request so that in the future, if a dispute arose, there would be some written memorandum respecting the matter. From an examination of the entire record we are satisfied that this requirement that defendant's written offer be signed by plaintiff before a partnership relationship would be deemed created was wholly an afterthought on the part of defendant. We shall later point out why we deem this conclusion completely justified.

Defendant's offer was accepted by plaintiff when, acting pursuant thereto, he went to Klamath Falls and assumed the active management of the business of United. Everything done thereafter by the parties is explainable only upon the theory that a partnership actually existed between them. Plaintiff fully and faithfully performed the oral agreement on his part to be performed. Defendant also performed in accordance with its terms.

We are not at all impressed with defendant's contention that no partnership existed because plaintiff never signed the typewritten memorandum that he prepared. Neither do we consider as satisfactory his attempted explanation of the innumerable acts of partnership to which we have heretofore directed attention. He testified that these acts were performed and continuously carried on because plaintiff had the right at any time to sign the memorandum, and, if signed, the agreement would be retroactive to January 2, 1945. Defendant testified that he expected plaintiff to sign, but admitted that over a period of nearly four years he never once suggested to plaintiff that he do so. If such a state of affairs as defendant testifies to had

existed for a few weeks or months only, his explanation might reasonably be accepted, but not as regards actions continuing without interruption over a duration of five years. The memorandum truly expressed the terms of the oral agreement between the parties, except for the disagreement about plaintiff's salary, the amount plaintiff was to pay for his one-half interest, and the rate of interest to be charged by defendant. However, plaintiff accepted the salary of $250 per month, and the amount he was to pay for his one-half interest out of the profits was set up on the books as $2,750, with interest at 7 per cent. Plaintiff knew of these modifications of the agreement as he related it, because annual statements were furnished to him by defendant. As before observed, during the entire period from January 2, 1945, to November 1, 1949, both parties performed in accordance with the terms of the written memorandum. True, some changes were agreed upon during the time in question, but all alterations were such as partners might reasonably be expected to agree upon to meet changed conditions.

■ Having operated under this memorandum for approximately five years without objection, accepting its benefits and obligations, both parties must be deemed to have acquiesced in and ratified it as a true expression of their actual agreement, and by their silence when it was their duty to speak if not satisfied, both are estopped now to take a position inconsistent with their conduct. *Young v. Neill et al.,* 190 Or 161, 220 P2d 89, 225 P2d 66.

Defendant further testified:

"Q. And all of that time [up to 1949] you were still assuming that he would accept this offer that you made?
"A. Yes.

"Q. Was there any change outside of the fact that you said there was more money paid to Mr. Meads? Was there any other change in your relationship from the time he came over here from Medford, in the early part of 1945, until November 1949?

"A. There was never any change made except *the relations were of employer and employe.*

"Q. We have heard you say that a lot of times, what your contention of that—

"A. That is true." (Italics ours.)

We have emphasized a part of defendant's answer above, because, throughout his testimony and upon every possible occasion, he volunteered a similar statement. It is quite evident that he sought to impress the court by this unnecessary repetition. Paraphrasing the queen in Hamlet, "The witness protests too much, methinks."

The typewritten memorandum that defendant prepared at the request of plaintiff is in words and figures as follows:

"AGREEMENT

"Klamath Falls, Oregon Jn 2, 1945

"M. C. Stott, party of the first part and sole owner of the United Outdoor Advertising Comapny [sic], hereby agrees to sell to Frank R. Meads, hereinafter refferred [sic] to as party of the second part, one half interest in the said Company for the sum of $2750 together with interest at 7% on any defferred [sic] payments after Jan 1, 1946. Payments of both principal and interest to be made out of the one-half net earnings of the business. The same to be computed on th [sic] 1st day of January of each year and disbursements made after all outstanding debts of the Company have been made [sic].

"M. C. Stott, party of the first part, further agrees to finance the Company by making loans

to said Company in any amount that is necessary to keep all bill [sic] paid and sufficient working capital to permit any expansion of the business necessary to growth and success. And it is further hereby agreed and understood that all such monies so advanced by the party of the first part shall be repaid with interest at the rate of 7%, said payments to be made before the net profits of the business are computed and credited.

"M. C. Stott, party of the first part, further agrees to and guarantees to pay to Frank R. Meads, the salary of $250.00 per month, and to further allow as expenses any trips taken on business for the Company which may hereinafter be determined as necessary to the conduct of the business—said expenses to be charged as a legitmate [sic] expense to the conduct of the business and so paid by the company.

"M. C. Stott, further agrees to keep a set of books and records of the said Company's transactions including a check book, same to be open for inspection to Frank R. Meads at all times, and for this service the company agrees to a monthly charge of $20.00 to start.

"It is mutually agreed by and between the parties hereto that all disbursements of whatever nature is [sic] to be made by check on the signature of M. C. Stott and that full supervisory management and custodianship of all cash checks is to remain with M. C. Stott until such time as the purchase price of one half interest, viz $2750 together with any accrued interest, has been paid in full; then and in that event, Frank R. Meads steps into full control and authority of one-half interest of said business with joint signature on all checks and joint control over all management . . then all decisions of management and policy and expenditures are to be mutually agreed on and satisfactory to both parties concerned before same are executed.

"In consideration of the above committments [sic] on behalf of M. C. Stott, party of the first

part, Frank R. Meads, party of the second part, does hereby agree as follows:

"To pay the sum of $2750 with interest on deferred payments at the rate of 7% on and after the year 1945, to M. C. Stott, to make Klamath Falls, Oregon his home, to do all the work of selling, posting, maintaining, the plant except in such cases where additional common labor is needed to erect additional boards or to remove boards from present location or the painting of bulletins and agrees to maintain this policy of doing all the work until such time as the plant exceeds 75 poster panels regardless of whether this contract is paid for or not.

"It is further mutually agreed that in the event of death of either party, surviving partner, by reason of this agreement, has the option to buy the deceased [sic] share in said business at the sale price as determined by the value as shown by the books of the Company."

The foregoing is written on a single sheet of letter-size paper. No provision is made at the bottom for date or signatures. This omission indicates quite clearly that the writing was intended simply as a memorandum of the oral agreement, and not as the basis for a formal written contract.

We now invite attention to some additional evidence in the record which has led us to conclude that the signing of this memorandum as a prerequisite to the formation of a partnership was an afterthought on the part of defendant. Before doing so, however, we wish to invite attention to the emphasized portion of defendant's testimony above relating to certain alleged delinquent personal accounts owed by plaintiff. This testimony was offered by defendant as a reason for plaintiff's demand that his salary be increased. We

believe this testimony also represents an afterthought of defendant.

It will be remembered that defendant opened and kept all books and records of United. Among the books of the company is the ledger. We first turn to a page of that ledger where the following entries appear:

"Frank R. Meads—to be paid
M. C. Stott        Account

"BUSINESS   If services are satisfactory

TERMS   To be paid out ½ Profit of Business after all Indebtedness paid

| "DATE | ITEMS | DEBITS |
|---|---|---|
| J 1946 | | |
| Jan 1 | to be pd from ½ profits | 2750.00 |
| " 1 | to be pd M C Stott Interest | |
| | 1946 | 137.50 |
| Dec 30 | to be pd M C Stott | |
| | Int 1947 | 137.50 |
| | "Bal Dec 31, 1946 | 3025.00" |

We now turn to the next sheet of the ledger where we find the following:

"Frank Meads ½ Interest to be paid out of ½ earnings

"BUSINESS   If services are satisfactory

TERMS   ½ interest in business plus 7% Int from Jan 1946—after Indebtedness pd *as per typed contract of Jan 1945* (Italics ours.)

| "DATE | ITEMS | DEBITS |
|---|---|---|
| 1946 | | |
| Jan 1 | ½ Interest | 2750.00 |
| | "Bal Dec 31, 1946 | 2750.00 |
| | "Frank R. Meads | |

Personal Bills paid by Co—which he contracted but would not and did not pay—to keep credit of United good, they were paid by United—

"1949

| | | | |
|---|---|---|---|
| May 14 | Howie Bros | 59 | 8.25 |
| May 15 | Ball & Porter | 60 | 150.39 |
| May 30 | 1 yr—7% Int | 60 | 22.68 |
| Sept 10 | taxes 1947-1948 over ½ paid MCS | | 243.16 |
| Aug 13 | L Taylor pd Mead | | 15.00" |

Examining this sheet of the ledger carefully, we find that the statement "as per typed contract of Jan 1945" is written with darker ink than the other matters set forth immediately preceding. We also find that all that portion appearing under the heading of "Frank R. Meads" and referring to personal bills is written with the same dark ink. It is obvious that the statement "as per typed contract of Jan 1945" and the other matters written under the special heading "Frank R. Meads" were written at one and the same time.

This conclusion is further demonstrated as being correct by another sheet of the ledger which refers to defendant. There the following appears:

"M C Stott  Due from Meads
if services satisfactory

"BUSINESS Int at 7% per annum

To be paid out of ½ profit of business after indebtedness paid *as per typewritten agreement in vault U S Nat Bk* (Italics ours.)

| "DATE | ITEMS | CREDITS |
|---|---|---|
| 1946 | | |
| Jan 1 | Due from Meads | 2750.00 |
| 1947 | ½ Int to be pd from Profits | 137.50 |
| 1 | Interest 1946 | 137.50 |
| 1948 | | |
| Dec 30 | Int 1948 | 137.50" |

The above statement "as per typewritten agreement in vault of U S Nat Bk," together with all detailed items respecting credits, except that referring to 1948, were written with darker ink than the first statements appearing on that page, dark ink of the same type as that appearing in the Meads account as above pointed out. It is significant that no such changes in the use of ink appear upon any other of the large number of ledger entries relating to the personal accounts of the parties or to accounts of third persons.

It is manifest that defendant made the additional entries after difficulties arose between himself and plaintiff in the fall of 1949, and when litigation was imminent. There is no doubt that the first entries were made when the books were opened in January, 1946. It is evident defendant mistakenly thought that, in this manner, he was bolstering up his case. From this a well-warranted doubt naturally arises regarding the truth of all of defendant's contentions respecting questions of fact in dispute. When the ledger was admitted in evidence, the trial court's attention was not directed to these supplemental entries in the record. Neither was our attention called to them in the briefs nor upon the oral arguments of the parties. We are firmly of the opinion that, had the able trial judge been advised of this situation, his reaction thereto would

have been the same as ours. Where there is a sharp conflict in the testimony, as there is in this case, ''a straw will show which way the wind blows.''

In tinkering with the books as noted, defendant apparently has been caught in a trap of his own making. The statements which he added to the record, viz., ''as per typed contract of Jan 1945'' and ''as per typewritten agreement in vault of U S Nat Bk,'' indicate that he considered the typewritten memorandum as constituting the contract of partnership between himself and plaintiff; it is an admission against interest on his part that there was such a contract; it is a practical construction which he himself placed on the writing; and, as before stated, the parties, throughout the years, acted pursuant to its terms. Defendant is estopped, therefore, to now question it. *Young v. Neill et al.,* supra.

■ It is well established by the authorities that the existence of a partnership inter se depends on the intention of the parties. *Powell v. Powell,* 181 Or 675, 693, 184 P2d 373, *Willis v. Crawford,* 38 Or 522, 532, 63 P 985, 64 P 866, 53 LRA 904; 68 CJS, Partnership, 414, § 10.

■ ■ In determining the intent of the parties, a variety of facts and circumstances may and should be taken into consideration. There is no exclusive or arbitrary test or general rule which will determine the question of partnership in every case, and each depends on, and must be governed by, its own particular facts and surrounding circumstanes. 68 CJS, Partnership, 432, § 20 a.

In 68 CJS, Partnership, 433, § 20 a. (1), it is stated:

''In conformity with the general rules and requisites of the law of partnership considered supra §§ 8-20b, it is well settled that, where the parties

to a contract, by their acts, conduct, or agreement show that they intended to combine their property, labor, skill, and experience, or some of these elements on one side and some on the other, to carry on, as principals or coowners, a common business, trade, or venture as a commercial enterprise, and to share, either expressly or by implication, the profits and the losses or expenses that may be incurred, such parties are partners."

See *Flower v. Barnekoff,* 20 Or 132, 25 P 370, 11 LRA 149.

The clear preponderance of the evidence in this case shows that plaintiff agreed to and did combine his labor, skill, and experience with the property and financial assistance of defendant to carry on the business of United as a partnership. True, plaintiff paid no money to defendant directly for the one-half interest in the property of the firm, but under their agreement he was not required to. This was to be paid out of the profits of the venture. Though nothing was said in the agreement about sharing the losses, nevertheless, that is implied. As was stated by this court in *Lee v. Ellis,* 121 Or. 259, 267, 253 P 873:

"It is now settled beyond a doubt, that there need not be any specific agreement to share losses as well as profits, the other elements being present, in order to constitute a partnership. Where parties engage in a common undertaking or business, with the understanding that they are to divide the profits, it follows naturally, in the absence of any specific understanding to the contrary, that they must share the losses."

In his brief defendant makes the following contention:

"The Statute of Frauds completely bars all claims of plaintiff. Plaintiff's complaint alleges that the parties entered into an agreement of part-

nership which continued for more than 5 years * * *. This was denied by defendant. Such an agreement would have been terminable at will and therefore would have been a valid agreement of partnership, even if oral, 37 C.J.S. 574, Frauds, Statute of, Sec. 66. On the trial, however, plaintiff relied upon a completely different agreement. He relied upon an oral agreement to buy a half interest in the business for $2500.00 or $2750.00 and to form a partnership which would not be terminable for several years. The moment that plaintiff's contentions were stated in court defendant raised the issue of the Statute of Frauds * * * and relied upon it throughout the remainder of the case * * *."

Defendant, in support of his claims, invites attention to § 2-909, OCLA, which in part reads as follows:

" * * * the agreement is void unless the same or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party to be charged * * *:

"(1) An agreement that by its terms is not to be performed within a year from the making thereof;

" * * * * * *

"(5) An agreement for the sale of personal property at a price not less than $50.00 unless the buyer accept and receive some part of such personal property, or pay at the time some part of the purchase money; * * *."

Defendant did not affirmatively plead the statute of frauds as a defense, but irrespective of the question of pleading, this defense is not available to him under the facts and circumstances of this case.

▪ Plaintiff contends that the case was taken out of the statute of frauds because of part performance on his part. In *Young v. Neill et al.*, supra, at page 166, Mr. Justice LATOURETTE, speaking for this court, said:

"The statute of frauds was never designed to shield against the perpetration of a fraud."

■ Where one party to an oral agreement performs acts pursuant to the terms thereof and directly referable thereto, such as materially changing his position to his disadvantage or otherwise doing something that he would not have done but for the agreement and which would result in substantial injury to himself if the other party were permitted to hide behind the statute of frauds and disavow the same, and when the other party has received and enjoyed the benefits of the oral contract, equity will prevent the other party from setting up the statute as a defense.

As stated in *Young v. Neill*, supra, at page 179:

"The foundation of this doctrine is fraud; not necessarily an antecedent or positive fraud, but a fraud inhering in the consequence of this setting up the statute. It applies where to permit the defense would be inequitable and unconscionable. Seymour v. Oelrichs, 156 Cal. 782, 106 P. 88, 134 Am. St. Rep. 154, and note; Pomeroy, Specific Performance of Contracts (2d ed.), §§ 104, 107; Pomeroy, Specific Performance of Contracts (3d ed.), § 96; Story, Equity Jurisprudence (3d ed.), § 1409, et seq.; 49 Am. Jur., Statute of Frauds, §§ 578, 580."

In 49 Am Jur, Statute of Frauds, 885, § 579, the following is stated:

"The courts have repeatedly asserted the principle that the statute of frauds is not to be applied in such a way as to shield actual fraud or aid its perpetration, and a court of equity, so far as it can do so consistently with the intent and purpose of the statute, will in every proper way act to prevent a party to an oral contract from shielding himself under the statute when to permit him to assert the protection would enable him to commit a fraud on the other party to the contract, *or enable him to enrich himself unjustly at the expense of the other.*" (Italics ours.)

In 49 Am Jur, Statute of Frauds, 734, § 428, it is said:

"The acts of part performance, in order to be effective to remove an oral agreement from the operation of the statute of frauds, must be referable to and induced by the contract relied upon, and must have been done with a view to its complete performance. The acts proved in part performance must refer to, result from, or be committed in pursuance of the agreement proved. They must have been in consequence of the contract and such as would not have been done but for the contract * * *."

See *Howland v. Iron Fireman Mfg. Co.*, 188 Or 230, 213 P2d 177, 215 P2d 380; *Tiggelbeck v. Russell et al.*, 187 Or 554, 213 P2d 156; *Hunter v. Allen*, 174 Or 261, 147 P2d 213, 148 P2d 936.

■ In this case everything done by the parties was directly referable to and induced by the agreement relied upon and proved. Plaintiff gave up his position with Foster & Kleiser in order to perform his part of the contract; for nearly five years he continuously performed all things required of him by the agreement. When he assumed his duties as manager of the business, he took actual possession of the personal property of United, an undivided one-half interest of which belonged to him, payment therefor only being deferred until it could be made out of the profits according to the agreement. Over the years he performed services far and beyond those usually performed by an ordinary employe or hired manager, and such as could be expected only of one having a financial interest in the enterprise. Under his management the income grew from almost nothing to a considerable sum; the inventoried value of the property was substantially increased by the addition of new equipment. As previously noted, all the acts of defendant were also

directly referable to and grew out of the contract. Defendant received and enjoyed the benefits of plaintiff's services, the increase in the property of the company, and its income.

To permit defendant to repudiate this agreement would result in gross injustice to plaintiff and be wholly inequitable and unconscionable. He is estopped to now take a position inconsistent with his acts and conduct.

The decree is reversed and this cause remanded with directions to enter a decree dissolving the partnership and winding up its affairs pursuant to the provisions of §§ 79-601 to 79-615, inclusive, OCLA.

Plaintiff is entitled to costs.

PETITION FOR REHEARING

*U. S. Balentine* and *Mark Simons,* of Klamath Falls, attorneys for appellant.

*Farrens & Maxwell,* and *W. J. Moshofsky,* of Klamath Falls, for the petition.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK and TOOZE, Justices.

TOOZE, J.

Defendant has filed a petition for rehearing based upon several grounds, all of which are directed to alleged error on the part of this court in its determination of the facts. As typical of the grounds assigned for a rehearing, we quote assignment numbered I, reading as follows:

"This court erred, and its opinion and decision should be corrected, in that:

"(a) This court was inconsistent and contradictory in indicating, (typewritten decision pages

2 and 3), that a trial court would be reversed only for 'a manifest abuse of discretion', and then finding that a matter on which the trial court had been unable to exercise his discretion required a reversal, to-wit:

'When the ledger was admitted in evidence, the trial court's attention was not directed to these supplemental entries in the record. Neither was our attention called to them in the briefs nor upon the oral arguments of the parties. We are firmly of the opinion that, had the able trial judge been advised of this situation, his reaction thereto would have been the same as ours. Where there is a sharp conflict in the testimony, as there is in this case, 'a straw will show which way the wind blows.' (Typewritten decision, page 22)''

In our opinion, page 513, we said:

"At the outset, it should be stated that there is a sharp dispute in the testimony as to whether or not the parties entered into a copartnership agreement. It ensues, therefore, that in considering the record before us, we have kept in mind the well-established rule that, where the facts are disputed, *the final determination of the trial judge* in reference thereto *is entitled to great weight.* In all such cases this court *is reluctant* to disturb the trial court's findings in the absence of a showing that there has been *a manifest abuse of discretion.*" (Italics ours.)

■ Defendant's contention is based upon the use of the words "a manifest abuse of discretion." He ignores the real gist of the opinion in the respects under discussion; viz., that the findings of the trial judge upon the facts in an equity proceeding are entitled to great weight. He also ignores the statement that this court "is reluctant" to override such determination. Being reluctant to do a thing in no sense means that this court will not do it in a proper case.

■ This is a suit in equity, and it is tried de novo in this court. We have a responsibility to consider and weigh all facts in the case and to arrive at our own independent conclusion as to wherein lies the truth. Though the initial determination by the trial judge is entitled to great weight, largely because he has the advantage of observing the conduct and demeanor of the witnesses, whereas we are necessarily confined to a study of the cold, printed record, nevertheless, we are not bound by his findings, and the rule mentioned is one of expediency only.

We concede, however, that the use of the phrase, "a manifest abuse of discretion" is perhaps ill-advised, because, as is clearly apparent from the grounds urged upon us for a rehearing, it may lead to misunderstanding and confusion. No question of "abuse of discretion," as that term generally is interpreted by the profession, is involved. We certainly did not wish to be understood as using the word "discretion" in the broad sense of the term "judicial discretion." In fact, we did not, nor do we, intend to convey the idea that the findings of fact of the trial judge in an equity suit are entitled to more than great weight.

■ Defendant complains that this court erred in attaching some importance to apparent supplemental entries made in the ledger kept by him, because the attention of the trial judge had not been called to them. He overlooks the fact that this ledger was duly admitted in evidence and was a part of the record that not only we, but also the trial judge, were called upon to consider. Defendant kept this ledger and is presumed to know its contents. If he desired to explain any entries made therein, he had an opportunity to do so while on the witness stand. The tinkering with the books to which we invited attention is perfectly obvious. The

dates set forth respecting the items of charge under the special heading "Frank Meads" indicate quite clearly when the entries were made. *Meads v. Stott.* However, it should not be assumed that this matter alone led to our ultimate conclusions; in fact, it was among the less important considerations.

In reviewing the facts of this case, we gave careful attention to the entire record. We see no reason for changing our ultimate conclusions. The petition for rehearing is denied.